IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF TEXAS

MARSHALL DIVISION

MOBILEMEDIA IDEAS, LLC )(
)( CIVIL DOCKET NO.
)( 2:10-CV-112-JRG
VS. )( MARSHALL, TEXAS
)(
HTC CORPORATION, ET AL. )( APRIL 22, 2013
)( 9:00 A.M.

PRE-TRIAL HEARING

BEFORE THE HONORABLE JUDGE RODNEY GILSTRAP

UNITED STATES DISTRICT JUDGE

APPEARANCES:

FOR THE PLAINTIFF: (See attached sign-in sheet.)

FOR THE DEFENDANT: (See attached sign-in sheet.)

COURT REPORTER: MS. SHELLY HOLMES, CSR
Deputy Official Court Reporter
2593 Myrtle Road
Diana, Texas 75640
(903) 663-5082

(Proceedings recorded by mechanical stenography, transcript produced on a CAT system.)

I N D E X

April 22, 2013


| | Page |
|---|---|
| Appearances | 1 |
| Hearing | 3 |
| Court Reporter's Certificate | 170 |

COURT SECURITY OFFICER: All rise.

THE COURT: Be seated, please.

All right. This is the time set for a pre-trial hearing on MobileMedia Ideas (MMI) versus HTC, Civil Case 2:10-CV-112.

Let me ask for announcements at this time.

What says the Plaintiff, MobileMedia Ideas?

MR. BAXTER: Good morning, Your Honor. Sam Baxter and Jennifer Truelove, McKool Smith, for the Plaintiff, along with Paul Bondor, Jonas McDavit, Laurie Stempler, and Tamir Packin from the Desmarais Law Firm, and we're ready, Your Honor.

THE COURT: All right. Announcements from the Defendant?

MR. HEARTFIELD: Good morning, Your Honor. Thad Heartfield. I'm here for the Defendants HTC. I have some new faces to introduce to you. Mr. Terry McMahon, Dan Alberti, I have Hong Lin sitting on the bench, Yar Chaikovsky, and David Beckwith. Also with us today, sitting out there is Owais Siddiqui. He's Senior Director of Patent Litigation with HTC. Defendant is ready.

THE COURT: Okay. Thank you, Mr. Heartfield.

All right. Let me go over some housekeeping

matters with counsel before we get into hearing argument on some of the pending matters -- motions.

As you're aware, this case is set for jury selection on the morning of April the 29th. The Court will allow each side 30 minutes per side for voir dire -- voir dire of the jury panel. The Court plans to select two juries that morning. In all likelihood, the other jury will be selected first, and you'll be selected second. That's still somewhat in the air.

During the 30 minutes per side that you're allowed to question the panel, the Court will allow each side to use up to three minutes to give a brief high level overview of your contentions in the case. You are not to argue your case to the jury panel. That is briefly for information to give them a thumbnail sketch of where you think the facts will take you in the case, but it should not lapse into argument. And that's limited to three minutes or less. The remainder of your time should be to specifically and directly question the panel.

The Court will have the Clerk's Office here play the patent video for the entire panel before the voir dire process begins. It's my intention to seat eight jurors in this case, and each side will be afforded four preemptory challenges or strikes.

There are no jury questionnaires that have been submitted to the Court, so I assume that issue is out. You'll just cover that territory you might have covered with questionnaires as part of your voir dire examination.

Based on the Court's schedule, I'm going to tell you at this time the trial is going to start at 8:30 on May the 13th. And the Court has scheduled that entire week for the trial. I'm going to afford each side 12 hours per side to put on your case-in-chief. That 12 hours does not include openings or closings.

With regard to opening statements, the Court will afford each side 25 minutes per side to make your opening statement, and the Court will afford -- afford each side 30 minutes for your closing statements.

With regard to closing statements for the Plaintiff, you must use at least a third of your time in your initial closing. You can't get up there and give them one minute and then have 29 for your final go-around, okay?

During the trial of the case, beginning May the 13th, the Court will be in chambers each morning by 7:30. I do that intentionally so that if there are issues that arise during the evening the night before, we have an opportunity to take them up before the jury

comes in about 8:30 and we start that day's trial. That hour is for your benefit, counsel. Woe unto he or she who has something that could have been brought up between 7:30 and 8:30 and doesn't bring it up until after 8:30 when we've started the trial. That is also a part of the Court's effort to make the use of your allotted 12 hours as efficient as possible and to infringe on that as little as possible so that you have as much of that to use in putting on actual evidence as possible. So if there are issues that arise that the Court needs to give some direction to, I'll be in chambers by 7:30 each morning.

Also, the Court's policy, if -- if there are any disputes regarding deposition clips is to hear those on a rolling basis. If there are disputes as to deposition clips, I want to know about it the morning of the day before you intend to play the deposition clip. So if you've got a deposition clip for Wednesday, I want to hear about it Tuesday morning. If it's for Thursday, I want to hear about it Wednesday morning, et cetera. If you have deposition clips that are disputed for the first day of the evidence on Monday, I'll hear about them after jury selection on the 29th.

I'm also telling you that it's all but certain we are not going to cover every pre -- every

pre-trial matter today during this hearing. So you need to be prepared to participate in a second pre-trial the afternoon of the 29th after the jury is selected. If I'm going to select two juries that morning, that will pretty much eat up the morning and maybe the beginning of the afternoon, but there will be several hours in the afternoon that should be left, and we'll use those for additional pre-trial in this case.

With regard to exhibit objections, that is something we probably will not get to this morning -- or today. It's the Court's policy to try and hear all live disputes as to the admissibility of exhibits before we start the trial of the case-in-chief.

The Court's policy is to go through the disputed exhibits during the pre-trial and rule on their admissibility. Those that there is -- there are no disputes about or those that are disputed and the Court finds are properly admissible are considered pre-admitted and may be used during the trial of the case-in-chief without any additional predicate or argument over their admissibility.

That's another way I try to give you as much of that 12 hours for actual trial as possible. If we can take the arguments over exhibits out, that gives you much more of that 12 hours to put on evidence. So

before the case-in-chief starts, it's my intention to get through all of the exhibit objections and either have them out of the case or have them pre-admitted.

With that in mind, I will need to have the parties file their joint notice of outstanding exhibit -- exhibit objections before midnight on this Wednesday, the 25th. That way we'll know by the second pre-trial on the 29th what is left and what is not left. And I would strongly encourage counsel to meet and confer with all diligence to try and reduce that list as much as possible by agreement.

If -- if you'd like, a reference for a template or a guide on that joint notice of outstanding exhibit objection, if you're not familiar with the Court's practice on that, I refer you to Docket Entry 213 in the SSL versus Citrix case, which is 2:08-CV-158. That's not magic, but it's a place to look at -- place to look if you're not familiar with the way that's been done in the past here.

The Court is going to require that the parties jointly prepare and have available for the use during the trial juror notebooks. Those notebooks will be compiled jointly by the parties. You should have 10 copies available to deliver before the evidence starts on the 13th. Those juror notebooks should contain

within them copies of the patents-in-suit. I understand there's some streamlining that may have taken place. We'll get into that later this morning, but whatever the -- are the live patents-in-suits as of the 13th, they should have copies in the juror notebooks, a copy, as well, of the Court's claim construction chart showing the claim terms, and the adopted construction by the Court should be included in those juror notebooks.

Also, those notebooks should contain a single page for each witness that you intend to call, either live or by deposition. Those pages should have at the top a photograph of the witness imposed at the top of the page with their name underneath. Below the name, simply blank lines for notes or whatever. You are not to identify the witness as either the Plaintiff's witness or the Defendant's witness, simply a picture, a name, the rest of the page with ruled lines on it.

The Court finds that it's very helpful to the jury in recalling testimony to be able to see the person's picture who testified rather than writing down names of people they haven't seen before the trial starts.

Additionally, you should include a three-hole punched legal pad in each juror notebook for additional notes the jury may wish to take. If there

are witnesses that it's uncertain whether they're going to be called or when they're going to be called, those notebooks can be supplemented during the trial. If -- you don't have to have every page with every picture in for Day 1. It would be better to have it that way so that we don't have to waste time adding and supplementing, but I will accommodate you to the effect -- to the effect that if we need to supplement the witness pages in the juror notebooks, we can do that as long as they're timely available well in enough time before we start trial that day that we can put them in there.

We're going to talk about these disputed pre-trial matters in just a minute, and this will probably come up as a part of that discussion, but I want to make it clear and I want to give it some additional emphasis by mentioning it separately and independently of the remaining pre-trial matters.

The Court expects both sides' witnesses to stay with the confines of their reports. It is a serious matter for the Court when one side alleges that the other side's expert has gone outside their report. We are not going to engage in a trial by ambush. We are not going to surprise one side or the other with something that's not in their expert's reports.

So I just say that so that you'll know full well that the Court considers that a very important matter. I have -- I have penalized parties by reducing their time -- remaining time for trial when I've been convinced their witnesses have attempted to go outside the scope of the parameters of their reports. I have threatened to grant a new trial depending on who won or lost after the verdict came in, based on people attempting to go outside the scope of their report. I tell you this just to emphasize the fact that this is important to the Court, so bear that in mind.

All right. Those are more or less the housekeeping matters. Are there any questions from counsel with regard to what I've just gone over?

MR. BONDOR: None -- none from Plaintiff, Your Honor.

THE COURT: Anything -- any questions from the Defendants?

MR. HEARTFIELD: Your Honor, will the Court be providing the panel list to the parties ahead of time?

THE COURT: The Clerk's Office will have that available, Mr. Heartfield. Typically, I'll -- I'll refer you to Ms. Anderson in the Clerk's Office in that regard, but, typically, it's usually Thursday afternoon

before jury selection on Monday that that's available. But I'll leave that to her. She will certainly make it available at whatever time she can to both sides at the same time.

MR. HEARTFIELD: Thank you, Your Honor.

THE COURT: I assume that's your only question?

MR. HEARTFIELD: Yes, Your Honor.

THE COURT: Okay. Previously, the Plaintiff had filed a motion to strike supplemental report by the Defendant's damages expert, and I believe there's been a motion to withdraw that and the parties have indicated by joint motion for leave that they intend to supplement the experts' reports on damages for both sides.

Is that still the status of things? Nothing's changed there?

MR. BONDOR: Yes, Your Honor, that is still the status of things. I think based on the additional streamlining and the severing out of -- of four of the patents for trial later, not in this trial, that that will have to be done in any event so that the parties can exchange their, if you will, final numbers for this trial based on the patents that will be tried now.

MR. ALBERTI: Dan Alberti for HTC. Yes, we intend to file the supplemental report as we submit it

to the Court.

THE COURT: All right. Well, I'll grant the withdrawal of Plaintiff's motion to strike, and I'll grant the joint motion for leave for both sides to supplement their damages reports.

MR. ALBERTI: Thank you.

THE COURT: With regard to streamlining, I understand there's been a motion to streamline. I also understand the parties have reached some agreement on that matter.

Can somebody recite for me how and -- and in what ways the parties have agreed to streamline the case?

MR. BONDOR: Yes, Your Honor. Should I approach the podium?

THE COURT: As long as our court reporter can hear you and I can hear you, you're welcome to speak from where you are.

MR. BONDOR: Okay.

THE COURT: If you'd like to be at the podium, that's fine. I will say during the trial, all communication from counsel will be from the podium. But given the number of folks in the room, that this is pre-trial, if it's easier for you to speak from there, it's okay, as long as we can hear you.

MR. BONDOR: Thank you very much, Your Honor.

After Friday's conference with the Court and -- and given the time available for this trial, MMI proposed to proceed with four claims -- four patents, and a total of eight claims from those four patents. The four patents that we've selected for this trial are the '979 patent, Claims 18 and 26; the ' '796 patent, Claims 17 and 24; the '075 patent, Claims 5, 6, and 10; and the '078 patent, Claim 73.

THE COURT: All right. Yes, sir?

MR. CHAIKOVSKY: So -- so the only thing we'd ask, Your Honor -- we did not discuss this this morning -- is with respect to the remaining patents and/or claims that are not being tried in this action, we'd asked that they be dismissed without prejudice. They can obviously bring them again in a separate action.

THE COURT: What's the Plaintiff's posture on that?

MR. BONDOR: Our -- our posture is that it would be more efficient simply to sever them out for separate trial at the Court's earliest convenience.

My understanding is that with respect to the -- the Court's calendar and the time available for

this particular trial with 12 hours a side, that severing out those four makes sense, but we don't think it makes sense to start all over again. We're trial ready with respect to those four patents also and are -- are doing this to streamline the case at HTC's request and -- and at -- at the Court's suggestion, as well, and so we think it would be more efficient simply to sever and try at the Court's convenience.

THE COURT: Let me ask you this, do the Defendants have attached counterclaims to the patents that would be streamlined and not a part of this trial? Are there live counterclaims -- this is some of the patents that have been --

MR. CHAIKOVSKY: We have asserted DJ counterclaims, Your Honor.

THE COURT: All right. Well, the Court's policy has typically been that there is a legitimate 7th Amendment issue on the Plaintiff's side because the constraints that would keep them from otherwise litigating all eight of their patents and all of their asserted claims is imposed by the time limitations that the Court has placed on them, not anything that the Defendant has done.

So I'm going to sever all of the patents and associated claims other than the ones enumerated by

Plaintiff's counsel and direct the Clerk to open a new file with the new case number and transfer those.

Additionally, any associated counterclaims by the Defendant will be severed and treated in the same way. And for purposes of ease, counsel, I'm directing that this be done, but the best way to get it done mechanically is for there to be a joint submission from both parties in an order that does this. And I'll direct that you jointly submit an order for my entry that effects this severance.

MR. BONDOR: Thank you.

THE COURT: All right?

MR. BONDOR: Yes.

THE COURT: Okay. That is the streamlining issue.

The Defendants have filed a motion seeking leave to file a motion with regard to willfulness. I'd like to hear from the Defendants on this motion.

MR. MCMAHON: Terry McMahon, Your Honor. I'll go to the podium --

THE COURT: That'd be great.

MR. MCMAHON: -- because I've got a fair amount of paperwork here.

Your Honor, we filed this motion because the issue of willfulness lay dormant here in this case for

two years. It came up on the 10th of April when the draft pre-trial order submissions came from the -- the Plaintiffs, and they indicated that they were going to be asserting willfulness.

Now, to back up, when this -- the evidence of willfulness in this case was on February 12th, 2010, or thereabouts in February, just before this case was filed. About six weeks before the case was filed, there was a notice letter from Mr. Horn, who's the CEO of MMI. Six weeks later -- and by the way, Your Honor, there were -- there were 53 products, 54 patents. There was no claim in that letter as to -- to which patents were infringed by which of those products. So there wasn't anything that tied anything together.

So six weeks later and -- the complaint was filed, and that was on March 31st, 2010. So HTC actually made a motion to dismiss because the allegations in the complaint were simply the words "willfulness." There wasn't any facts contained in the complaint. The Court decided that the bar for willfulness was low and denied the motion.

HTC then sent out an interrogatory to the other side on June 14th, 2011. And on July 14th, 2000 (sic), we got an answer back, and the answered contained essentially three facts that related to willfulness.

One, the letter that I just described from Mr. Horn that was in February of 2010.

Two, incorporated the complaint.

And, three, the infringement contentions were incorporated.

And then Plaintiffs said, if necessary -- if necessary, we will amend and supplement, which was never done. And, in fact, in January of this year, 14 interrogatories were, in fact, amended and supplemented by the Plaintiff, not this one.

So then when we got the -- the draft pre-trial order on the 10th, we were obviously surprised. We called. We asked them for a meet and confer. And, in fact, we did meet and confer on the 15th of this month, and they said they were going to move forward with it. So we then immediately filed this motion.

So that's why we filed for leave, because we were surprised, in fact, that they were going forward, this issue having lain dormant for two years. And we think at the end of the day, as you have done before, that the -- the issue of -- of willfulness, the -- the first prong, the objective recklessness, has to be dealt with. And here, that issue is going to be bounded by the answer to that interrogatory.

What Plaintiff has done subsequent to the meet and confer was to inject some additional evidence that they claim is willfulness evidence. One, the verdict in the Apple case that -- the MMI/Apple case in Delaware, which by the way was three of the patents which they've limited this case to. But the Apple products have a different -- their -- their operating system is different. Obviously, it's the IOS or Apple's operating system. The designs are different. Here, our HTC phones are android devices. It's completely different. It's an open operating system, as opposed to the closed one that Apple used.

So we don't think that can have any evidentiary value, and it's late. And it -- and it shouldn't be considered at all because it wasn't part of the -- the interrogatory.

Then -- then what they did was submitted some testimony from HTC engineers -- in-house engineers where they were asked: Did you look at the patent? Have you read the patent? And to an engineer, they said, no.

Now, this was all post-filing, post-filing. And they claimed that that somehow post-Seagate is evidence of willfulness, which it is not. There is no duty any longer to investigate, and that was the key

part of the -- the Seagate decision back in 2007 that the Underwater Devices case, Your Honor, was overruled. It had been the -- the law for 25 years, but it was overruled in that case. There is no duty.

And -- and at this point, six weeks before the case was filed, we had four and a half dozen patents, you know, that they put HTC on notice with, and four and a half dozen products. Six weeks is not enough time to do any analysis in any event. Then we were sued, and then the lawyers took over.

And there were re-examinations filed. Your Honor is -- is familiar with those because it's the subject of some other motions here today. And some of those patents were in re-examination. Those claims were eliminated. Some of them were amended. And, in fact, some of the patents got through.

But the issue here is on willfulness, and on that -- the first prong of that test that the metes and bounds of what Plaintiff can pursue is limited by their answer to the interrogatory, which to this day, to this moment, as far as I know, they have yet to amend. So there is no basis for willfulness in this case.

THE COURT: All right. Let me hear from the Plaintiffs on this, and I assume part of why we're arguing about this is that there's an assertion of

willfulness on one or all four of the remaining patents?

MR. BONDOR: Yes, Your Honor. If I could hand up a copy of the slides just to briefly make a point, Your Honor.

So, Your Honor, just to start off, the idea that a claim goes away because it's supposedly has lain dormant is a little bit of a strange one to us, and I'd like to start off just by recounting the procedural history for this particular motion.

So MMI's complaint alleged willful in -- infringement from the very beginning. This case has already come through the period of time in which the parties were required by the Court to file letter -- letter briefs on summary judgment motions or for any motion that required a hearing. That passed months ago.

Despite that fact, HTC asserts now that, well, it wasn't until the pre-trial order was filed that they knew that we were asserting willfulness and -- and that's just not true.

In fact, in -- in Plaintiff's view, we feel that there's -- there is sufficient evidence for -- to meet both the objective and subjective prongs of the willfulness test to support a jury verdict of -- of willfulness. Those core facts are the same facts that were identified in our interrogatory response. HTC was

put on notice to the patents-in-suit since at least February 2010, yet it continues its actual infringement as demonstrated by our infringement contentions and -- and subsequent expert reports consistent with those contentions.

Discovery has shown that they've continued that infringement by never implementing a design-around effort, and also the -- on the objective prong, just to address the -- the issue of the Apple trial, contrary to what Mr. McMahon said, whether or not the Apple products were different, it doesn't eliminate the relevance of the Apple trial to the question because it relates to the objectiveness of HTC's invalidity defenses which are very similar if not identical to the invalidity defenses that Apple put on.

The patents-in-suit have been repeatedly subjected to re-examination, and the Patent Office has confirmed the patentability of original claims in the patents over hundreds of pieces of prior art.

With respect to, you know, HTC's underlying decisions not to do anything, factual testimony or factual evidence developed in discovery basically established that HTC's employees acted in willful disregard of that patented technology. And that, too, goes to both the objective and ultimately the subjective

prong. So we have multiple instances where HTC employees confirmed, consistent with our interrogatory response, that HTC has not undertaken any efforts and hasn't undertaken any investigation and, frankly, that they don't care about MMI's products.

And we've pulled out two examples of this. These are two prominent engineers. One is HTC's engineer, Lotus Chen, who HTC identified in their initial disclosures as somebody knowledgeable regarding applications for the android operating system used on the accused phones. In his deposition testimony, Mr. Chen confirmed that, you know, he supervised HTC's team of engineers related to the accused phones, and we asked him: Have you ever read any of the claims of the patents to figure out whether they cover HTC products?

And he says: I haven't read any one of the patents involved in this lawsuit.

We asked him why?

He says: I didn't read them, and I didn't have time.

We asked him: Well, do you want to read the patents?

No, I don't.

Why not?

Why should I?

Well, would you be looking -- willing to look at the claims now to determine whether or not HTC's products infringe them?

Well, why should I have the interest in doing it?

Does it matter to you whether MMI's patents cover HTC's phones?

To me right now it's not in the scope of my responsibility.

And Steve Wang said essentially the same thing.

So in our view, it ultimately -- it is the Court's determination as to whether or not the evidence will support both the objective and the subjective prong for willfulness. But along the lines of what I know is Judge Davis' practice in -- in the context of willfulness allegations, in our view, particularly giving the fact that -- that HTC has chosen to delay what's essentially a summary judgment motion well past the time for such things and -- and filed its motion, you know, without leave on the eve of trial to try to -- to get rid of -- of what they apparently believe is a troublesome issue for them, that the Court should address that evidence after it comes in and -- and not

on, you know, a snapshot that is -- that is necessarily put together on the spur of the moment on the basis of -- of their surprise motion, but -- but rather listen to the facts as they come in, determine whether or not we've met the objective hurdle, and -- and let it go to the jury, if necessary. Or if Your Honor feels that it does not meet the objective prong, then it can be taken care of at that point.

THE COURT: All right. Anything further from the Defendant?

MR. MCMAHON: Yes, please, Your Honor.

THE COURT: Not -- not just to reiterate, but anything new?

MR. MCMAHON: I won't.

THE COURT: Okay.

MR. MCMAHON: To let this testimony in during the course of the trial, given the state of the answer to the interrogatory in this case, it would be highly prejudicial. Obviously, these depositions were taken through translators. What the testimony here was that these witnesses -- these Taiwanese engineers relied on the legal department.

Now, Mr. Bondor has told you that there was no design-around. That was not referred to in the answer to interrogatory. He referred to the -- to the

Apple verdict. That was not in the answer to the interrogatory. He refers to these deposition testi -- deposition testimony, none of that was in the answer to the interrogatory.

So -- so, Your Honor, at the end of the day, this is highly prejudicial. They have not made out their case. They have failed in their burden. They have not amended this answer to interrogatory. And they can't do it now. They are trying to bootstrap this, and the time has passed.

THE COURT: Well, thank you, counsel.

It's the Court's view that under the current state of the law, the first prong of this analysis is solely an issue for the Court. And the Court takes that responsibility very carefully, very seriously, and traditionally has viewed this as a matter that's best decided by the Court after the close of the evidence. And given the lateness of the motion, given the Court's responsibility to make a decision as to recklessness, I'm going to deny the Defendant's motion for leave to file a motion for summary judgment on the issue of willfulness.

I will certainly exercise my obligation to analyze the evidence and the facts and give you a ruling on this first prong clearly before we charge this jury.

But I'm not going to cut off the ability for the Court to benefit by hearing what there is to be produced during the trial before having to make that decision and determine whether the first prong is met or not and whether this issue is proper for the jury.

So the ruling on this is to deny the Defendant's motion for leave.

MR. MCMAHON: Your Honor, may I just say one more thing?

THE COURT: If you think it's necessary.

MR. MCMAHON: I -- I do.

THE COURT: All right.

MR. MCMAHON: My concern is, is if they begin to put in evidence that we just saw today, that we will object to that, and I would hope that in limine, we could --

THE COURT: We'll get to the limines later, counsel.

MR. MCMAHON: Okay. Maybe we could discuss this at that point.

THE COURT: I'm anticipating that we will.

MR. MCMAHON: Thank you, Your Honor.

THE COURT: Okay.

MR. MCMAHON: I'm sorry.

THE COURT: That's all right.

Also, by way of pre-trial items to be dealt with, the Court's aware that you've mediated in this case with a mediator in California. I've seen a reference in the mediator's report that the mediator thinks it would be a good idea if the Court construed an additional 20 means-plus-functions terms. I don't find that either side has affirmatively urged the Court to act in that regard. But just for purposes of clarity, this Court has no intention at this late date to reopen claim construction and to try and take on the construction of 20 means-plus-function terms that a California mediator thinks might be helpful.

So if anybody has any questions about that, that's where the Court stands on that issue.

I did inquire earlier whether there had been a discussion among the parties as to an additional mediation. Have the parties met and conferred on that issue, and is there anything planned, or do you need some directive from the Court? Where -- where do we stand on that, counsel?

MR. HEARTFIELD: Your Honor, Mr. Baxter and I are working on that. We have received a time frame from Judge Folsom that we just need to clear on our dockets and hopefully set up a session.

MR. BAXTER: We will set up a session with

Judge Folsom probably next week, Your Honor. He's -- his calendar has cleared up, so probably after jury selection, we will -- we will get a date in Dallas and the parties will meet.

THE COURT: All right. Well, I would -- I'll assume by those representations that that's going to happen. I'm ready, willing, and able to order it if anybody wants to back out at the last minute, so you need to go forward with that understanding. Clearly, in light of everything we've got before us, the sooner that can be done, the better.

All right. Thank you.

MR. BAXTER: Thank you, Your Honor.

THE COURT: Counsel, if you don't see that you can get the mediation set to take place by or before the 2nd of May, let me know. And the reason I tell you that is I have the 3rd of May open, and if we have remaining issues that, despite our efforts today and on the afternoon of the 29th, we don't get through, I have a potential third date available on the 3rd of May for the remaining pre-trial, so if -- if that day is going to be needed, I'd like to know. If it's not, that would be helpful, as well.

So to the extent Judge Folsom's calendar affords you an opportunity, my request would be that you

mediate by or before the 2nd.

All right. In light of the streamlining that has taken place, there were several live discovery-related motions pending. It looks like to me that the motion from the Plaintiffs to reopen discovery as to this source code issue regarding nuance is probably gone in light of the streamlining; is that correct?

MR. BONDOR: It's not necessary to address it, Your Honor, before this trial, but it would be necessary --

THE COURT: I'm not saying forever. For this trial?

MR. BONDOR: That is correct, Your Honor.

THE COURT: Okay. There were some discovery motions that in our February hearing I heard and carried. Are those still live? I've heard nothing on those since then.

MR. BECKWITH: Your Honor, there is on HTC's motion to compel production of documents. This has to do with the -- shall I approach, Your Honor, or is it okay to speak from here?

THE COURT: I can hear you fine, counsel.

MR. BECKWITH: This has to do with the -- the Court's order compelling MMI to take actions

relating to the Sony and Nokia licenses. You may recall from our February hearing, one of the specific instances that we pointed to were Nokia licenses with Qualcomm -- Nokia agreements with Qualcomm that were originally disclosed to us or that we learned of through the materials considered in MMI's expert report. And then the expert report was modified to take that information out.

We thought, based on the Court's ruling and the letters that were sent out, that we would then get from Nokia or from MMI those Nokia/Qualcomm licenses. In fact, as we had pointed out during the hearing, the -- the licenses are actually in the hands of the Desmarais law firm, the same law firm representing MMI in this case.

When we did not receive the Nokia/Qualcomm licenses, which are very important to us since some of our devices are accused of infringing because we use Qualcomm products, we asked, where are the Nokia/Qualcomm licenses? And we were told in response to that, MMI doesn't have them. If Nokia doesn't give them to you, you're not getting them.

And -- and so we find ourselves, I think, in the -- because this occurred Tuesday of last week, we -- we asked for the follow-up because the -- Friday before

we had gotten additional licenses. The licenses have been dribbling in overtime.

When the Nokia license to Qualcomm did not appear, we said: Where is it? We want it. We know you guys have it. And the response we got was: If you didn't get it from Nokia, MMI doesn't have it. MMI's counsel has it, but MMI doesn't have it, so you're not going to get it.

So we find ourselves in the position where the Court carried the request that we had made previously for an adverse -- an adverse inference instruction, and I think we're there at that point. And we're happy to submit further papers on this if -- if the Court would like.

THE COURT: I -- I remember very well the lengthy discussion in February about what efforts had been made to get these licenses and giving specific instructions on more targeted steps to get that done. And having not heard further, I thought, in essence, that had worked itself out, but it may not be the case.

MR. BECKWITH: Your Honor, the licenses have been showing up on a rolling basis. The report that was made to the Court pursuant to the Court's order said, Nokia and Sony will be providing rolling responses. And we've been getting responses as late as April 5th, was

the last foreign language license that we received. We have not received the -- the -- the Nokia/Qualcomm license. That's why we followed up last week and said: Where is it?

THE COURT: Do you want to respond, Mr. Bondor?

MR. BONDOR: I do, Your Honor. Thank you very much.

I -- I think that there are a couple of things that need to be sorted out so that you can understand the true state of affairs with respect to the parties' interactions and actions after Your Honor's direction on February 1st.

Your Honor directed that we make formal application, formal requests, CEO-to-CEO, from MMI to both Nokia and Sony. We did so. Your Honor asked that we submit a report no later than two weeks later -- I believe it was February 14th -- regarding the status of those inquiries and what had happened. We did exactly as Your Honor requested. And, in fact, got responses back from both Nokia and Sony stating that though HTC had previously not only requested but gotten discovery from various Sony people -- and, actually, with respect to Nokia in particular, Nokia pointed out that HTC, contrary to what -- what -- what was suggested here in

the courtroom on February 1st, HTC had, in fact, served discovery requests both domestically on Nokia and through the Hague, and Nokia had, in fact, produced license agreements personally to those previous discovery responses a year ago and HTC never followed up with that, never addressed any supposed shortcomings with respect to that.

Independent of all of that, Nokia, in its response, stated that it would review -- that it had reviewed its licenses or other licenses at HTC's request through Your Honor's direction that covered the patents-in-suit, and they produced -- they identified them in their February 12th report to us, which was also filed with the Court on the 14th. They identified a subset of -- of -- of agreements -- I believe that there were about six cross license agreements that Nokia identified as covering the patents-in-suit, and said that they would produce and did, in fact, produce.

The only rolling basis with respect to Nokia related to the necessary step of notifying the opposing -- the other party to the license agreement that they were going to do so. They did. And HTC got those documents from Nokia back in February.

So it came -- now, after -- let me address one other -- one other issue. With respect to the

rolling production and foreign language documents that Mr. Beckwith just talked about in an effort to excuse the late date that they're raising this one on, those were Sony and the Sony production was, in fact, more rolling than the Nokia one. But, in fact, the Sony -- Sony rolling production is now complete, also.

Now, Your Honor will recall that the Court had a status conference with local counsel about a week or two weeks after the report to the Court to find out, is this issue live or has it been taken care of? And with respect to HTC at that point in time, the representation was made -- this is taken care of from our side. There wasn't anything else other than Sony's production, which was then rolling, but Nokia's production had -- I'm sorry -- am I going too fast or just too loud or --

COURT REPORTER: You're fine.

MR. BONDOR: Okay. Nokia's production was consistent with what it had told the Court and with its report to the Court. It did not include the Qualcomm licenses which Your Honor will recall were inadvertently sent because they were the wrong set of licenses that were sent to Mr. Sims, MMI's damages expert in the case. As soon as that mistake was identified, it was corrected.

HTC, for what it's worth, has been well aware of those licenses in other litigation, and McDermott Will already has those licenses from other litigation. But the fact remains that that was the source of their request for licenses from Nokia that covered these patents-in-suit.

The -- the Qualcomm licenses were just something that they said, we don't think we got everything, but they never made a specific request for -- for Qualcomm licenses. After the reports were done, they never asked for Qualcomm licenses. And, in fact, until April 16th, when Mr. Beckwith suddenly sent us another e-mail saying, hey, what about these Qualcomm licenses, we didn't think that there was any issue and we still don't think that there's any issue.

We did take the additional step of passing along Mr. Beckwith's request to Nokia's counsel, but -- but I think that the full course of action, in fact, shows that all the issues associated with third-party license production from Sony or Nokia were taken care of at Your Honor's direction, precisely as Your Honor directed, and they have said nothing at all on that until earlier last week.

However, what did come out through the Court's conference with local counsel is that despite

having produced some of HTC's license agreements at our request, HTC has continued to refuse to produce the HTC/Apple settlement agreement, and we did raise that as the outstanding issue with respect to the license -- the parties' license agreements disputes.

And that one is still alive, and we request the Court direct production of a non-redacted copy. It is -- it is being withheld on the claim that it's not relevant. And we still view that it's discoverable, and they came clean with respect to other license agreements, but not that one. They're holding on to that one. And -- and we still think that issue is still live. But we do not believe that there is any merit to -- to Mr. Beckwith's statement that -- or -- or any merit to Mr. Beckwith's statement that the Nokia/Qualcomm licenses have anything to do with this case or were the subject of a specific request from them.

On the contrary, Nokia said what they were producing. Nokia said what they had already produced, and HTC didn't do anything until they sent this e-mail to us last week.

THE COURT: All right. Let me ask this of Mr. Beckwith. First of all, explain to me why the Nokia/Qualcomm licenses were not raised in the parties'

joint pre-trial submission to the Court in anticipation of this hearing? I don't find that it was in your proposed pre-trial order. And if you will, additionally, speak to the Plaintiff's request as to this unredacted copy of the Apple license that they're raising. I understand a redacted copy to what extent redacted, I don't know, but a redacted copy has been furnished.

MR. BONDOR: I can fill Your Honor in if you -- if you'd like on that.

THE COURT: No, I want to hear from him first.

MR. BONDOR: Thank you, Your Honor.

MR. BECKWITH: Your Honor, I -- I believe under the pending motions by parties, it -- it -- it's the No. 1 item under HTC's pending motions, ECF 219, in the -- in the pre-trial order.

In -- in -- in addition, in connection with the -- the pending motions that the Court has before it on MMI's motion for summary judgment on certain of the affirmative defenses, we have a specific declaration in place alerting the Court to the fact that there is an incomplete production of licenses relating to our affirmative defense of implied license. So we believe that the matter is in front of the Court both by

including it in the pending motions by -- by the party, HTC's motion to compel production of documents, as well as the -- the other motion, MMI's motion.

Your Honor, I've been handed actually a copy of the list of pending motions, and I -- I see that it -- it appears as though it inadvertently does not include ECF No. 219, which is a --

THE COURT: It's not on my list.

MR. BECKWITH: It's a typographical error in our list of pending motions with which I would apologize for and ask that it -- that it be included. We apparently had a problem moving our table over from our internal list to the list that was included in the list of pending motions.

It is covered under the MMI motion for summary judgment of affirmative defenses. The same issue is briefed in that motion. Excuse me. Mr. Bondor says that it wasn't specifically requested. At Page 37 of the Court's transcript from the February 1st hearing, we specifically identify two Nokia licenses MMI's expert has considered as part of his analysis. We specifically brought it to the Court's attention that we were looking for the Qualcomm licenses.

Now, they're telling us that although we've gone to Nokia, although we've gone to MMI, we know it

exists, and we know they have it because they accidentally put it on an expert report. They haven't produced it to us, and they won't produce it to us. I don't know what else we could do to try and --

THE COURT: So there are accidents on both sides of the case so far?

MR. BECKWITH: I'm sorry?

THE COURT: There are accidents on both sides of the case so far?

MR. BECKWITH: There are accidents on both sides of the case, and the Court has the opportunity to -- to correct them.

The Court recognized at the February hearing, it's highly relevant, it should have been produced. We're asking that it be produced.

THE COURT: All right. Clarify this for me, Mr. Bondor. Both of these disputed items, the Nokia/Qualcomm item and the Apple item, I assume the representations made are correct that they're in your possession or readily available to you?

MR. BONDOR: No, not quite, actually, Your Honor. So with respect to the issue of -- of those -- the Qualcomm licenses and the -- some of the licenses that he is talking about that were referred to at the February 1 hearing are in possession of Desmarais LLP as

counsel to Nokia in an ITC action against HTC of which McDermott Will -- with which McDermott Will is also involved. That is different from MMI having possession of those licenses.

THE COURT: I -- I understand that.

MR. BONDOR: Okay.

THE COURT: But the physical documents are close -- close by.

MR. BONDOR: The physical documents, yes, we do have them. The --

THE COURT: Okay.

MR. BONDOR: -- other point that I would make, Your Honor, is --

THE COURT: No, we don't need any further points.

MR. BONDOR: Thank you.

THE COURT: I'm going to carry both of these, counsel, and think about that during your mediation. But I'm going to carry both of these.

MR. BONDOR: Thank you, Your Honor.

THE COURT: All right. We next have Defendant's motion to dismiss for lack of standing, and I'll hear argument on this.

Also, I'm told that earlier when I talked about the joint exhibit submission, I said, Wednesday,

the 25th. I think Wednesday is the 24th. So it's Wednesday, not the 25th -- Wednesday the 24th.

MR. BONDOR: Thank you, Your Honor.

THE COURT: Even the Court is not perfect, so I understand that with everybody.

Go ahead, Mr. Beckwith.

MR. BECKWITH: We -- we -- we all have our -- our -- our drawbacks sometimes.

On HTC's motion to dismiss, Your Honor, I think we laid this out in -- in fairly great detail in our -- in our papers. There are just a few of the substantive rights that I want to touch on that MMI lacks because that's the test, whether MMI has all substantial rights in the patents.

We know from the VirnetX case that these rights must be viewed in the aggregate. We can't just look at them each individually and make a determination, Right No. 1, well, you don't have that, or you do have that, and I'm only going to consider them individually. We have to look at them in the aggregate.

And -- and so what do we know? We know that Sony and Nokia each have significant equity interests in MMI. Now, we've seen from their -- their papers that they refer to the shell corporations that intervene between Sony and Nokia, one of them being referred to, I

think, as Nokia Capital, which is this intermediate shell company that Nokia used to transfer patents and the like.

When we go to the Court's docket and we see what was filed by MMI, the fifth filing in this case is the corporate disclosure of interest in the case. And the interest in the case says: Nokia Corporation has an interest in the case. And it says: Sony of America, Inc., has an interest in the case. So they've told the Court from the very outset that these companies have significant economic interests.

THE COURT: So you're not saying that the underlying assignment to MMI was less than absolute? You're just arguing that the equity position of these entities, such as Nokia in the resulting MMI entity, supports your motion?

MR. BECKWITH: Well, they're actually two different things.

THE COURT: I mean --

MR. BECKWITH: Yes, to the second, Your Honor. And as to the first, they do have the -- what -- what I'll refer to as sort of the -- the legal boilerpoint -- boilerplate that they -- they say, I assign all right, title, and interest. The -- the Court had that legal boiler -- boilerplate in the VirnetX

case, too. That's the beginning of the -- of the question. The beginning says: Yes, you have the -- the language that says: All right, title and interest. But then the -- the Court in VirnetX tells us we need to look beyond that. We need to look beyond just what the legal boilerplate says, and we need to find out what -- what was reserved, what rights were reserved?

THE COURT: But you're not arguing that the types and the extent of the reservations that existed in the VirnetX case exist in this case?

MR. BECKWITH: Some of them do. Some of them do. And, in fact, in this case, some of them are even -- there's even a greater level of a -- a dissolution or a -- a disaggregation of rights. For example, in the VirnetX case, the -- the company that had made the transfer, SAIC, had no one on the board of directors of VirnetX. They couldn't control what VirnetX did. They didn't have their handpicked people sitting on the board telling them what to do.

THE COURT: But you're -- you're -- you're staying from the underlying assignment. I want to know your position on the underlying assignment because quite honestly, my view of it, unless you convince me otherwise, is that the types of reservations that existed in the VirnetX case that supported that Court's

finding don't exist in this case with regard to the underlying assignment.

Now, your arguments separate and apart from that as to equity interest, position on the board, you know, I -- I'll hear those, but I view those as -- as apples and oranges. And if you're going to tell me that the underlying assignment to MMI had the same types and -- and the reversionary interest set forth the transferring document itself were tantamount to the reserve -- reversionary interest set forth in the transferring document that was at issue in VirnetX, then I want to know that, but quite honestly, I -- I'm not seeing it that way, counsel. That's notwithstanding your other argument at a different level.

MR. BECKWITH: I -- I understand your -- your question now, Your Honor.

As -- as far as the assignment goes, the -- the assignment did carry with it this sort of a 10-year sunset provision. At the end of 10 years, the parties are going to get together and if they don't agree, then MMI is going to be dissolved. And so that's, from our perspective, inconsistent with an absolute assignment.

The agreements also prevent MMI from selling or assigning the patents-in-suit. And it -- one would typically think if there's an absolute assignment, that

the party who's receiving the assigned rights can do with them whatever they -- whatever they choose, and that's not the case here.

THE COURT: But a limitation on the alienability of the assignee is not a reversionary interest in favor of the assignor. It's just a limitation on the alienability.

MR. BECKWITH: I -- I would agree with Your Honor that in VirnetX, the security interest provided that if you don't pay us for what you've purchased, we can in a sense foreclose and take it back.

THE COURT: And I don't see that here.

MR. BECKWITH: I -- I don't believe that that is here, other than at the end of the 10-year period, there -- there's this built-in, you know, sunset provision, at the end of 10 years, we don't know who's going to own it. We also know that when I give it to you -- when I give it to you, you can only do certain things with it, and that is inconsistent with giving all right, title, and interest. It's inconsistent -- in -- in fact, it -- it -- some could say it's even worse than a security interest because, you know --

THE COURT: Some could say a lot of things.

MR. BECKWITH: Well, but by way of example, Your Honor, you buy a house, the -- the -- your bank has

a mortgage, but they don't have a right to tell you who you invite over for dinner. But in -- in a sense in this instance MMI -- I'm sorry, Sony and Nokia are saying, I've given you these patents, but you can't sell them to somebody else. You can't do with them what you like. And -- and so it comes with the strings attached, and it's the strings attached that the VirnetX court found to be ob -- objectionable. And there are a lot of strings attached here.

THE COURT: All right. But you'd agree with me they're not the same strings?

MR. BECKWITH: Some of them are the same, and some of are not.

THE COURT: Some are not.

MR. BECKWITH: The specific one that you're referring to, the security interest that says, if you don't pay, I take it back, that one particular string is not present. A lot of the other strings are. And some of them, as I point out, even -- even more so, more control was exercised over MMI than was present in VirnetX.

THE COURT: All right. Let me hear a response.

MR. BONDOR: Your Honor, I'm going to hand these up, but I can certainly be, I think, brief. To

address Your Honor's points, Mr. Beckwith is simply --

THE COURT: Just a minute. Okay.

MR. BONDOR: Mr. Beckwith is simply mistaken with respect to the assignment. Your Honor is exactly right. The assignments are absolute. They're assignments of all right, title, and interest. Mr. Beckwith's reference to the 10-year sunset period is not in the assignments. It's in the formation agreement for MMI. It dictates how the parties to the formation agreement are going to deal with their ownership interests in MMI. It doesn't having anything to do with ownership of the patents, and that is exactly the distinction that -- that carries this case away from VirnetX.

The assignment -- the assignment instrument in VirnetX was not absolute. The assignment had these reversionary interests attached to them. That's what gave SAIC a continuing actual direct ownership interest in the patents.

And the complaints that HTC makes with respect to Nokia and Sony subsidiary's positions as on the board of MMI or as part equity owners in MMI are not restraints in any way on the assignment. The -- the ownership is absolute in MMI. And I mean, that drives the decision or -- that -- in our view, that drives a

resolution of the question for standing because the question is provisional standing and is there somebody else out there who has an ownership interest, and the answer is no, as Judge Robinson has already decided once. So I would leave it there unless Your Honor has specific questions for me.

THE COURT: So if an asset is owned by Mr. Smith and Mr. Smith assigns it to Smith, Incorporated, and Mr. Smith is the stockholder and director of Smith, Incorporated, your argument is all of that doesn't count and the fact that the assignment was without a reservation or limitation --

MR. BONDOR: For the purposes --

THE COURT: -- answers the standing question?

MR. BONDOR: For the purposes of prudential standing, if the assignment is Smith, Incorporated, then Smith, Incorporated, has prudential standing because there isn't somebody else out there who can come back after HTC.

And none of the complaints that HTC makes of the alleged rights that -- or opportunities that -- that anybody on MMI's board has, if they were to act in derogation of their rights -- or pardon me, their obligations as fiduciaries to MMI, none of it changes

whose ownership interest they would be acting on behalf of in connection with MMI.

THE COURT: Anything further?

MR. BONDOR: Not unless you have specific questions, Your Honor.

THE COURT: No. But opposing counsel has something to add, I can tell.

Mr. Beckwith?

MR. BECKWITH: Thank you, Your Honor, I'll be quick.

One of the things I did want to highlight is that Sony and Nokia did retain a right to sublicense. And retaining a right to sublicense has been found by the Federal Circuit to be a substantial right. They have retained right to sublicense indirectly -- to indirectly controlled companies.

So by way of example, if Sony or Nokia were to acquire what would be considered an indirect controlling interest of any company, they retained the right to then grant a sublicense. So there's a -- an expanding universe out there of -- of entities that could be sublicensed under these patents, and MMI has absolutely no say over -- over what that universe of sublicenses is.

So the Federal Circuit has said retaining

rights such as the right to sublicense is a -- a substantial right. So those -- those are something I did not include in my initial comment. It is in our brief.

THE COURT: All right.

MR. BECKWITH: Thank you, Your Honor.

MR. BONDOR: Do you need me to address that, Your Honor, because we don't agree with that at all?

THE COURT: No, no, I'm -- I'm satisfied that I've heard enough argument on this.

The Court's conclusion is that the type of transfer and the reversionary rights that existed in the VirnetX case are clearly distinguishable from the facts of this case. The Court doesn't see, notwithstanding the Defendant's argument, that there is any other real owner other than MMI that would raise the standing issue of parties not properly joined in the litigation.

So I'm going to deny the Defendant's motion to dismiss for lack of standing.

All right. Next, we have two matters that I probably want to take up together just for purposes of efficiency. We have the Defendant's motion to strike certain invalidity contentions of the Plaintiff -- excuse me, we have Plaintiff's motion to strike certain of the Defendant's invalidity contentions, and we have

the Defendant's motion to strike certain of the Plaintiff's infringement contentions.

Four of these invalidity contentions the Court took up and heard argument on and expressly ruled on at our hearing on February the 1st. I understand that the Plaintiff's motion goes beyond those four and covers additional invalidity contentions. There has not been argument or an issue raised on Defendant's motion to strike infringement contentions by the Plaintiff, previously as a part of pre-trial argument in this case.

Let me hear from the parties on both of these. Unless there's some reason not to, let's just argue them jointly.

MR. BONDOR: Your Honor, the only accommodation I would request if Your Honor is willing, we actually divided the invalidity contentions and the infringement contention motions between two different people.

THE COURT: In other words, the Court's idea doesn't fit with your pre-prepared slides; is that right?

MR. BONDOR: I'll -- I'll tell -- I can -- I can make my exchange with -- with Mr. McDavit very quick if -- with --

THE COURT: That's fine.

MR. BONDOR: -- with Your Honor's indulgence?

THE COURT: That's fine.

MR. BONDOR: Your Honor, I -- I thank you for hearing this and -- and hope not to belabor it again.

If we take a look at what the history is, we have original invalidity contentions served by HTC back in July of 2011, and then we had HTC in June of 2012 seeking leave to add an additional 44 invalidity references over and above the -- some 400 previously-identified references and 250 or more obviousness combinations.

On January 9th of this year, when HTC served its invalidity expert reports, all of a sudden, references showed up in those expert reports that had never been previously charted under Rule 3-3. When the Court heard argument on February 1st with respect to the pieces of prior art that were then at issue, the narrowed subset of things that -- that HTC sought to add via motion to amend, the Court denied that motion to amend because HTC had not acted in compliance with the rules.

So if we go -- skip to Slide 26, please.

Less than 12 hours after that, HTC served

amended invalidity contentions, again, reporting to add exactly those references right back in. In our view, they were out. The Court ruled that they were out -- were out, and they should stay out.

With respect to HTC's newly amended in -- it should be invalidity contentions, the Court should strike the newly -- the -- the amended invalidity contentions that HTC filed on February 1st for exactly the same reasons that it denied HTC's previous motion. The references weren't properly disclosed because they were never charted. There is no demonstrated and cannot demon -- HTC can't demonstrate diligence or good cause to amend contentions under 3.6.

The amendments, in our view, were not made in response to the Court's claim construction or in response to any of MMI's amended infringement contentions, and are therefore improper.

I won't belabor the prejudice argument, except to say obviously, if we have a two-year run in this litigation or a year and a half before expert reports are due and HTC hides the ball with respect to things that it wants to rely on for the purposes of its expert report, it absolutely prejudices MMI to have them come in at this late date.

HTC actually makes the argument in briefing

that we're not prejudiced because we were able to scramble and respond to some of these things, but when HTC never gave any notice that they intended to rely on these references, never charted them in connection with the local rules, we obviously don't have the opportunity during fact discovery to explore whether any of this is, in fact, for instance, prior art or go take depositions of the inventors or anything else. It's -- it's simply a sandbag job.

And, therefore, on -- at the next slide, we request that the Court strike any reliance on the additional references, so we have the four that were the subject of the hearing on -- on February 1. And those are listed on -- on Slide 27 here. For exactly the same reasons, these new ones ought to be -- ought to be struck.

And with that, unless Your Honor has questions about our position, I can leave it.

THE COURT: No, I don't think I have any questions.

I'll hear a response from the Defendants.

MR. BONDOR: Thank you, sir.

THE COURT: Whenever you're ready, counsel.

MR. CHAIKOVSKY: Yar Chaikovsky -- excuse me, for Defendants HTC.

Your Honor, first, I'd like to comment on two things Mr. Bondor said. Number one, he says that the IBM My Simon manual was never charted or disclosed in our Local 3-3 disclosures at the outset of the case. That's absolutely false, and we'll demonstrate that to you. It was -- was shown in our -- our disclosures. In fact, it was disclosed, and I'll -- I'll present to you that fact.

We did not discuss, nor did you rule, I should say, on the IBM My Simon manual that refer to disclosure. Your ruling, in fact, using your words, was I'm going to deny the motion to grant leave to amend the Simon device as an additional invalidity contention because our motion was regarding the device. And, Your Honor, we -- we are not seeking to add the device at this point in time as an -- as an evidentiary exhibit or invalidity contention.

The second item with respect to GSM 04.83, I saw on their slide that they said it did not change their invalid -- infringement theory for the '075 patent. I would demonstrate to you that they absolutely did change their infringement theory with respect to the '075 patent.

If we go to the next slide.

So we have several references. Actually,

the first one we're not going to touch because it's a patent that's been severed. So the only three references, Your Honor, that we want to talk -- discuss is the Simon user manual, which was not the subject of the February 1st hearing, the device was. 4.83, which I will address, was in response to their infringement contentions. And, actually, the Schulhof which their -- their expert, Tipton Cole, also substantially revised his infringement theories with respect to that reference, Your Honor.

So if we go to the next slide. So we -- you can go to the next slide.

Timeline of events, Your Honor. So in our original invalidity contentions, I just mentioned will show that the Simon manual was there. We had your Markman order on the 12th of -- on the 10th of December. Their opening expert reports on infringement are on the 9th. They don't supplement their invalidity contentions or infringement contentions -- excuse me, Your Honor -- until the 14th. So we have these new theories never disclosed in interrogatories, never disclosed in infringement contentions until January of 2013.

And we'll get into later with respect to our motion to strike infringement contentions and/or expert reports of theirs whether that was proper. But I will

show you some of those new theories here because they're relevant to our ability to amend under Local Rule 3-6.

Next slide. We don't -- we can skip this. Go to Slide 10.

So we talk about the IBM -- next slide.

The IBM user manual is not part of our motion to amend. It was not in the -- the document that we filed. It was not part of the hearing. And as I just read to you your ruling, you ruled on the device. We withdraw our invalidity arguments at least as an evidentiary matter relying on as a 102, the device in and of itself.

But the user manual was disclosed in our original contentions in combination with Goodwin, which discloses the Simon. Simon is the Goodwin. If I showed you pictures of the Goodwin, which I'll show you a few here. The Goodwin patent discloses the Simon device within it.

And the IBM Simon manual in the original invalidity contentions was used, for among other things, what Your Honor eventually rules on, QWERTY keyboard for input means in your Markman order. The Court's Markman order construes first user input means to require QWERTY keyboard. Neither party, Plaintiff or Defendant,

proposed that construction, and I'll show you that, Your Honor.

Next slide.

So here we have Goodwin, which no one is disputing was in this -- this case. It discloses the IBM Simon within it, and that was in our original chart and in our original invalidity contentions. We can see on the figure here, Your Honor, the Simon device -- this is the actually device if I brought it here in the courtroom, that is the Simon device, as mentioned in the background of the -- the invention. A personal communication device Simon, announced by IBM Corporation in 1994, includes many features for facilitating communications. As shown in Figures 1 and 2, which this is one of those figures, Your Honor, the Simon device resembles and is a cellular television.

No one's hiding the ball. Everyone's on notice. If Your Honor -- I can show you many other figures. I think there's probably five or six that show various formations and accesses of the device. We're going to be talking about this patent during the trial. No one's complained about this. They showed the device. And as you can see in the brief description of the drawings, we have these figures, 1, 2, 3, 4, and 6 through 10, all dealing with different illustrations and

respective screens of the IBM My Simon device. And this, again, has been appropriately charted. We've never heard a complaint from them with respect Goodwin '804 patent. And, again, our expert will then show you, for example, as a demonstrative, the IBM Simon device, but not relying on those as -- as a reference, Your Honor.

Next -- next slide.

Now, we specifically disclosed the Simon Manual. Again, in our original contentions, July 1 of 2011, this long disclosure, it goes on for three pages. I've shown you two. And -- and this is one call-out, Your Honor. Why do I call this out? One of ordinary skill in the art would have been motivated to combine Goodwin, which we just showed you the patent, with the touch pad functionality of Simon. And we cite to the three pages of the user manual -- to arrive at a device having an input means comprised of a QWERTY keypad.

Well, at the time, we didn't know what the construction would be. We were being as careful as we possibly could at that point in time, and that's just one example. Everything highlighted here and carrying on to Page 77 deals with the Simon User Manual. You kind of -- you can't see it right here, but it's shorthanded right here, the Simon manual communication,

Simon for short, end quotes, at the beginning of our invalidity contentions in July of 2011. That's why we didn't move to amend it in 2012. It was already in the case.

Next slide.

And we can see in -- that the Simon User Manual, the Goodwin patent doesn't have an express disclosure. It has an inherent disclosure. By having the Simon device, the Goodwin patent has an inherent disclosure of a QWERTY keypad. But the Simon Manual has an express disclosure of a QWERTY keypad. We disclosed that in our original invalidity contentions, in fact. And Your Honor, in your Markman order, stressed the importance, as you can see of -- of a QWERTY keypad for the input means, again, which no party suggested was the construction.

If we go to the next slide.

And here we are with respect to the Markman order. Your -- Your Honor says that the first user input means is the first keyboard or its equivalence. And down below we see both parties' constructions. I apologize if it's hard to read, but both parties are saying keyboard, keyboard, keypad, not QWERTY keyboard. It's not there. And so you've spelled out that it's a QWERTY keyboard, and the IBM My Simon User Manual has a

QWERTY -- QWERTY keyboard.

And so we've gotten your Markman order and we go, okay, we've got the Goodwin patent. You have a Simon disclosure. At this point, we do need to chart in totality the Simon as an anticipatory or obviousness reference on its own, standing alone, given your ruling with respect to the Markman order.

Now, we can use it, as we've already disclosed in our original invalidity contentions, Goodwin for inherent disclosure or for obviousness disclosure, but now we understand the importance of using it alone because the express disclosure will be easier for the jury given the Ceats factors, the importance of it. We've been diligent on it on -- on the manual, and its importance really drives home, once we see your Markman order, and we do chart it. We chart it because of the dates in this case. The infringement con -- I mean, our -- our reports were due first, but we timely charted, per Rule 3-6, Your Honor, especially once we saw their infringement contentions. And we chart amended invalidity contentions, per Rule 3-6, relying on Simon.

Now, the manual as a separate and independent basis. And as a result of your Markman order, their supplementation of their infringement

contentions, we are allowed to supplement our invalidity contentions. Simon's in -- as I said, in combination with Goodwin, or as an inherent disclosure of a QWERTY keyboard but as a separate reference here in light of your Markman order, Your Honor.

I think that's all I have on the -- on the Simon. If you have any questions on the Simon, I'd be happy to address them, Your Honor. That is the new user manual itself. Otherwise, I'd be happy to move on to the next reference.

THE COURT: All right. Let's just move on.

MR. CHAIKOVSKY: Okay. So if we go to the next reference, which is the --

Next slide. Next slide.

So we've heard that -- that they didn't change -- it was on their slide. They didn't change their infringement read, Your Honor. Well, Dr. Meldal added a never previously disclosed infringement read relying on the GSM standard on January 9th, 2013. And, in fact, five days later, they served amended infringement contentions that don't even disclose everything Dr. Meldal disclosed. What they do is they incorporate by reference Meldal's report. But they amend and they incorporate by reference his -- his report in amended infringement contentions because they

recognize they need to amend their contentions.

And so our amendment to add GSM 4.83 is proper under 3-6. You know, we -- as you can see, we're citing a case. We've given a list to their altered infringement positions. If they're permitted to present this new theory at trial which for first time they detailed the GSM standards by number, the numbers I'll use -- I apologize, 24.083. Never in their contentions, never in their rogs, never in discovery disclosed to us what -- what GSM standards they're relying on. In fact, they previously just said GSM and CDMA in combination.

And from that, we're supposed to divine what theories they're -- they're -- they're following. So it's not until January 9th that we know they're dropping CDMA, and now we give you with particularity the messaging protocols of GSM call handling, how it goes back and forth, and we'll show you that.

Next slide.

So for the first time -- and this is in Dr. Meldal's report, January 9th, he details, it's not in any infringement contention. You won't find this anywhere. You'll just --

THE COURT: Didn't we argue all this in February, counsel?

MR. CHAIKOVSKY: No, no, we -- we did not

argue --

THE COURT: Didn't you have the opportunity to argue it in February since this is a report from January the 9th?

MR. CHAIKOVSKY: We were arguing on February 1st our motion that we filed in June. The motion we filed in June, Your Honor, did not deal with the 3-6 prop -- propriety of 3-6. In fact, I think what Mr. Beckwith was arguing was facts predating the -- the motion. If you look back through Mr. Beckwith's argument, I don't believe Mr. Beckwith was arguing activities that happened from your Markman ruling and thereafter, Your Honor.

And that's exactly -- we -- the reason we were able to make that filing on February 1st, Your Honor, the same day as our hearing, we had prepared that filing -- we couldn't have made that in one day. We -- Mr. Beckwith and I were here. We had prepared that filing in light of their amendments. And, Your Honor, you actually said during that hearing, there may be issues to come before you and based on the future, Mr. Beckwith raised that actually during the hearing that we may have further issues to deal with because of their amendments that they were making. And, again, like I said, you will be seeing a motion to strike their

infringement contentions because these weren't properly disclosed at any point in time, nor are they based -- some of them are not based on your Markman ruling.

So I mean, a lot of these go hand-in-hand. If they're allowed to amend their infringement contentions to have this detail, which for the first time doesn't just use the words -- the letters GSM and CDMA and they drop CDMA, but, actually, it gives you the details, which for the first time we see the standard, 24.083, which establishes normal operation of call waiting and call hold. Without that, they can't prove their case. Then they throw that -- they sneak this sentence in here, Your Honor. And we'll see the importance of all of these standards on the next set -- next slide.

If you go to the next slide.

So the next slide -- go to next slide.

That's their amended infringement contentions. So they add 24.083, which I show you at the top. Well, the prior art is 4.83. It's the same thing. It's call waiting and call hold. And they add this for the first time on January 9th. These are the same -- same standards, just one's in 2004 that appears, one's in '95.

If we go to the next slide.

More importantly, look at what they added for the first time on January 9th. The words of what they added and the words with respect to call handling because of this patent deals with handling multiple calls -- incoming call rejection, multiple calls, the words are identical, sans the number, 24.08, GSM 4.08. There is no difference.

And so if they had disclosed this earlier, I would agree with you, Your Honor, we shouldn't be allowed to bring this reference. Or, in fact, both parties shouldn't be allowed to bring this. That -- that might be equitable. But if they're allowed to add this at that late date for the first time, then just as the law here requires that we supplement in light of their infringement contentions, we, too, should be allowed to bring 4.83 in light of their supplementation of 24.083. For the first time, they can't point to an earlier date.

Next slide.

So, again, I'm just restating. We should be permitted to amend in response to their new contentions.

Now, again, if we want to not allow them to amend, that's a different story. We will not rely on that reference. But if they amend, we should be allowed

to amend. If they don't, we don't.
I think that's all I have on that reference, Your Honor.
THE COURT: All right. Let's go to the next one.
MR. CHAIKOVSKY: Okay. So the next one is the Schulhof '541, which we did handle with respect to the last one, Your Honor.
Go to the next slide.
Again, we have a situation here with our expert, Tipton Cole, on January 9th opening expert report for the '979 patent -- we've got some dyslexia here, I apologize -- added infringement contentions. So we -- we added, again, for the same reasons --
Go to the next slide.
So for the first time you see in Mr. Cole's report he actually adds various theories. Again, they can't point to anywhere -- they're pointing to a web browser that among other things accesses Internet resources using HTTP and HTTPS protocols. That's not in their original infringement contentions. They cannot point to where that is in their original infringement contentions.
Your Honor, I will apologize for a second. In fact, I have here -- can we go to the ELMO, please?

Thank you. Make sure I got this.

These are the bare bones infringement contentions we had until their January 9th report, Your Honor, for the '979 patent. In particular, I focus on the universal data interface element because I'm going to show you how that one gets blown out, this one right here, Your Honor.

Now, here where they say, each of the HTC phones is capable of receiving a digitized and compressed audio format signal comprised of one of several audio formats, such as MP3, MP4. Each HTC phone has structure. That determines the format of the incoming data file and provides the recognized format recognition information to the microprocessor. Other elements of the infringement contentions do the same.

I will -- Your Honor, I will show you, again, as you see in this next one, it's a bare bones. They cite some products in here. There's no citation or supplementation with respect to evidence done during the course of the case. They just mention products. Again, it's a high-level product description. Look -- this element. All they say is an MP-3 file having a total playback time of four minutes was downloaded from a computer. That's the entire detail we get. And it goes on with respect to the '979 like that. There is no

further detail provided.

What do I see when I go to Tipton Cole's expert report for the first time on January 9th? Wow. We see Mr. Cole's report as we get to these -- these similar elements. So Tipton Cole, as -- as he's dealing with these various elements, Your Honor -- so he says, my analysis focuses on these devices and he gives screenshots. As the analysis below demonstrates, they practice every claim element. So that's what he's going to say here.

Okay. How -- how does he show that? Well, Your Honor, he goes on to show screenshots. So now they -- they give us screenshots of devices. And -- and then they -- they're showing it hitting the Internet with HTTP -- PS. And I'm going to show you some more slides. He goes, I've tested these accused devices -- and, again, we don't get this until their expert report, to discuss EVO and Touch Pro and detailed below. And how does he discuss it? Well, as you can see from here, he says, each of the accused devices have that universal data interface -- that's the one I said to focus in on -- and they access Internet resources using HTTP and HTTPS -- that's not in their infringement protocol -- in their infringement contentions.

And what does he do? Wow. For the first

time, we -- we cite to user guides. Never done in infringement contentions. And, in fact, in their infringement contentions they supplement, it's not done. It just incorporates by reference this report, their amended contentions. That's their catchall that they're hiding behind.

They then go and show additional shots that they did not disclose in their infringement contentions. This is actually using a -- the device's web browser. And so showing from the user guide what he's going to rely on. Well, at least please provide us notice of the user guide that you were relying on, all these user guides. During discovery for the several years, as I've heard them raise several times before, they've never provided this notice. It's not in any discovery response. Their discovery response with respect to our theories of infringement said, see expert report.

How are we supposed to respond until we see expert report on January 9th? That's what the interrogatory answer said.

And he -- he goes on with these additional screenshots, citing these user guides for various manuals and various elements to show the elements exist. And I could go on, but we see the user manuals being used in various ways that we had no -- I mean, it's --

it's -- Your Honor, I mean, quite frankly, I would say it's a little bit of ambush in terms of their disclosure.

And, in fact, I guess the last one I'll say is same thing. He says, I understand the plain meaning of the term. He's considered HTC's proposed construction. Doesn't look like he's relying on your construction, Your Honor. So it's not due to anything you did. He's got the plain meaning, HTC's proposed construction, and he, you know, cites and adds a bunch of evidence. And it's not based on anything that you construed.

THE COURT: Well, the infringement contentions are not intended to make the entire case, counsel. There's always additional information as the case goes forward.

MR. CHAIKOVSKY: I -- I understand.

THE COURT: I mean, it seems like you want to reach backward in -- in looking in the rear view mirror say all these things that we now know about weren't there, therefore, none of what they propose should come in. But they weren't required to give you everything that exists at the time they made their infringement contentions.

MR. CHAIKOVSKY: Your Honor, I --

THE COURT: Just to put you on reasonable notice.

MR. CHAIKOVSKY: I -- I -- I agree with you that they don't need to provide. It's not to provide -- it is a notice provision, and it's not -- not to provide every, you know, shred of evidence that they're going to be relying on. That's -- that's not what happened here, as I've shown you with respect to the original -- Your Honor, there's no -- there's no -- there's no evidence. There's no shred.

At least, Your Honor, I -- in this district, as you know, there's broad disclosure requirements. I'm used to seeing supplemental infringement contentions during the course of the case. And there's a rog dealing with this, too, supplementing the rog during the course of the case. They never put us on notice that a browser is a universal data interface. So if you see this -- and I showed you Tipton Cole says, browser HTTP, that element that I show you on the screen, there's nothing about a browser. There's nothing about using a browser in that element, to use HTTP that Tipton Cole's got, that for the first time you see that in Mr. Cole's report. It just says, each HTC phone has structure of the terms of the format of the incoming file.

And so it's -- we've got new ideas. We've got evidence that, again, at least in my practice -- and I admit, it may be limited, Your Honor -- people supplement contentions to disclose. Just like we attempted to supplement the invalidity contentions, you -- you denied it with respect to certain references at the time based on that supplement. But they didn't supplement a chart. They didn't even make the effort. And their interrogatory responses say, see my expert report.

So we only have time to respond -- 30 days to respond to even their concepts or ideas that were never disclosed at that point in time. And so it's based on this lack of understanding of their position until we get Tipton Cole's report that then we go, wow, actually, there's several references, the Schulof being one of them, that are quite important. And because they amended, again, pursuant to the local rules under 3-6, we're allowed to amend, Your Honor.

THE COURT: Could you have and should you have filed motions to strike these infringement contentions because they didn't put you on notice like you now say they didn't because I don't see that you have moved to strike earlier?

MR. CHAIKOVSKY: Moved to strike the -- the

current infringement contentions, meaning the amended ones?

THE COURT: No, the original ones.

MR. CHAIKOVSKY: Well, I don't know that we'd strike the am -- you're saying move to strike the amended ones? I mean, again, it's -- I -- it's --

THE COURT: I mean, you're saying they didn't put me on any reasonable notice until the amended ones come along, and, voila, here's all this stuff that wasn't there before. What I'm saying is if the original ones were so vague and indefinite that you couldn't tell what they were trying to put you on notice of, was there not some relief that you could have come to the Court for at that time to either move to strike or move to have them clarify or do something to have a set of infringement contentions you could make sense out of? I'm looking -- I'm looking at it from your point of view.

MR. CHAIKOVSKY: From my point of view, what I would say is we have their theory here on the screen, Your Honor. I wouldn't say that I don't understand what's on the screen. I understand what's on the screen, just what they're doing on January 9th is not what's on the screen. That's -- that's the issue. If they had stuck with what's up in here as their

infringement contention, that's a different issue.

THE COURT: All right.

MR. CHAIKOVSKY: And -- and they had a duty to supplement and they have a duty to answer our interrogatory. And so I would say the onus was on them, Your Honor, just as it is on us with respect to invalidity contentions, Your Honor.

THE COURT: All right. What else do you have on this reference?

MR. CHAIKOVSKY: That -- that -- I believe go back to the slides, but I don't believe -- if we can switch back to the slides.

Next slide.

Just that you see that the Schulof talks about using the Internet, so they disclose the Internet. It's -- the top one has a modem. It's for a cable modem because it's a cable system and communication versus via the Internet. So, you know, he's going to rely on the Internet. The first time he relies on the Internet for that -- that element. So does this reference --

Next slide.

And we'll deal with this a little bit, Your Honor. I -- I would ask you, please, on -- with respect to this, to reserve ruling when we're -- as you wanted to take in combination. I would say, I was the lucky

one who got to argue this and the motion to strike the expert reports together. So I can address some of that with respect to this reference in that motion to strike since they have an alternative theory. But we -- we would respond that we should be permitted to add Schulof based on their new theory that was never disclosed.

THE COURT: All right. What else?

MR. CHAIKOVSKY: That is it on this motion. As I said, I'll be arguing the motion to strike. I'd like to, you know, be able to handle all of it so you'll see even further why Schulof is important based on what -- what transpired.

THE COURT: I understand your request.

MR. CHAIKOVSKY: Thank you.

THE COURT: Let me have a response from the Plaintiff.

MR. BONDOR: May I borrow that first page of the '979 that you had up on the screen?

It's not up here, but perhaps Mr. McDavit will make use of it.

Your Honor, I'm -- I'm going to be brief. I'm going to relate -- or argue specifically about the amended invalidity contentions to address what Mr. Chaikovsky has said with respect to them, and then I will cede the podium to my colleague, Mr. McDavit, to

address the complaints with respect to the infringement contentions.

I want to start off just by observing that the argument that you just heard from Mr. Chaikovsky as it relates to the Simon device and the Simon reference are exactly what was at issue and that the Court has already decided on February 1st. Mr. Chaikovsky is now suggesting that, oh, no, it was only limited to the device, and, therefore, we should still be able to make use of the user manual, because look here, the user manual has one passing reference to it in the invalidity contentions.

That's not accurate. We were arguing about the alleged prior art related to the IBM Simon. We understood that Your Honor ruled on the art related to the IBM Simon.

If I could have the -- the ELMO briefly.

This is from Exhibit A to HTC's motion to amend invalidity contentions. And as you can see on the screen, it says, the reference being supplemented, and it talks about the IBM Simon. The IBM Simon reference is plainly -- was at issue, along with the IBM Simon device when we argued on -- on February 1st.

Now, going back to the arguments that they made, we're hearing exactly the same thing. They say,

well, we charted Goodwin, and it's all the same. But as Your Honor ruled and as we discussed at the last argument, charting Goodwin is charting a patent. Relying on some other device or reference that isn't charted -- and Mr. Chaikovsky can't say that it was charted because it wasn't charted -- is not the same. And that's why Your Honor excluded it.

Exactly the same thing holds true for the Schulof '541 and -- and for the GSM standard. Though they want to now say that they're somehow justified by amended infringement contentions, we know from what HTC did here that their efforts to inject these never before charted references into the case has nothing to do with Your Honor's claim construction, nor with any amendment on our side because HTC tried to introduce them into the case months before there was even a claim construction order. They're not related to any amendment or anything that MMI did. Instead, this is just HTC trying to -- to cram these things back in the case when they've already been excluded by the Court.

So if we take a look at -- at Slide 28, in our view, HTC's excuses for amending the invalidity contentions don't satisfy -- oh, I'm sorry.

May I have the -- the projector back and Slide 28?

HTC didn't provide any 3.6 -- or 3-6 justification to amend invalidity contentions for the -- the references that are shown there. Supposed notice by passing reference in something else isn't a justification. Charting Goodwin isn't a justification. And the bottom line is that MMI never had proper notice under the local rules of HTC's invalidity theories on these references.

As I just mentioned, reasserting the GSM 043 wasn't made in response to amended infringement contentions because HTC sought to add them previously.

I'll -- I'll touch on the -- the two other bullet points there are -- Your Honor won't be surprised to hear that we don't think that we changed our infringement theory with the '075 patent at all.

As Mr. Chaikovsky showed you, the -- the invalid -- the infringement contentions from the get-go said that HTC's phones infringe because of compliance with the GSM standard. The fact that -- that in expert reports, as Your Honor recognized, additional detail is provided, does not mean that they weren't on notice. HTC never moved to say that they had no idea what we were accusing in connection with the GSM standard, and that can't serve as a justification either.

So on -- on that basis, Your Honor, we

submit that -- that Your Honor should not only keep out the IBM Simon device in reference, as Your Honor has already ruled, but for the same reasons ought to exclude all the other references -- invalidity references that were never charted previous -- previously.

And with that, if I could cede the podium to my colleague to address the issue of HTC's motion to strike our amended infringement contentions.

THE COURT: Just a moment.

MR. CHAIKOVSKY: Brief response, Your Honor.

THE COURT: All right, Mr. Chaikovsky.

MR. CHAIKOVSKY: If we go to the -- let's deal with the My Simon, Your Honor.

If we go to the ELMO.

Your Honor, that's your ruling. I'm going to deny the motion to grant leave to amend the My Simon device as an additional invalidity contention. What we were arguing about was the Simon and the Simon device. That was what was argument was about. Back when Mr. Beckwith argued it and presented it, the next one is the My Simon device is what we were arguing about at the time, Your Honor.

And so they're all -- we have the Goodwin patent, we have the user manual, we have the device. We didn't seek to add the manual because it was produced to

them in 2011, and it was in our invalidity contentions in 2011. We were here talking about the device which was not in our original invalidity contentions. We admit that. And that's why we're not asking leave to supplement with respect to the device, Your Honor.

With respect to GSM, as we said, they supplemented their -- their -- their expert report. Your Honor, this is the disclosure with respect to GSM in their original invalidity contentions. And I showed you everything that was in Dr. Meldal's report. Well, here they said, the HTC/GSM products are mobile phones. That's what they said. And they provided a paragraph. I'm not going to say they didn't. Do you see any standards, the 24.08? We do not see 24.083, and the details with respect to how we're going to get there are not there. This, Your Honor, you can see is the amended contentions, amended. This is not from their original invalidity contentions. I apologize.

So none of this -- none of this -- and I'd like the opposing counsel to show me where -- none of this is in their original contentions. And, in fact, this is in their amended contentions after they filed their expert report. And I just showed you the detail that's in their expert report, much more than this. So on January 14th of this year is the first time that we

know they're going after GSM products and that they're giving us any detail -- this detail with respect to the disconnect message and handling calls, Your Honor, not there.

For Mr. Bondor to represent it differently is actually a little bit surprising.

And same thing, Your Honor, with the Schulof reference. It's no different on the Schulof reference. I showed you it. I showed you the infringement contentions that were in it originally, and I showed you it now. And, yes, we did address as you -- the only two references that I'll agree were addressed on February 1st were 4.083 and Schulof, the manual was not, but not based on these issues, because of the Markman ruling and their 3-6 amendment, whether it's through their report, because that's where their detail is, or through their amended contentions, we, per the local rules, are allowed to supplement. And it's only equitable -- or these should be stricken -- their amended contentions should be stricken as improper supplementation because they're not based on your Markman result, Your Honor.

THE COURT: Let me ask you this, counsel. I haven't heard you speak to the McNelley '754. Do you have a position on that?

MR. CHAIKOVSKY: Oh, in terms of us

supplementing? We're dropping that, Your Honor.

THE COURT: What about -- what about these --

MR. CHAIKOVSKY: The rest --

THE COURT: -- references that they say were not charted, but we didn't take up on the 1st of February.

MR. CHAIKOVSKY: Any other reference that we -- I have not discussed, we are dropping, Your Honor, in light of streamlining of the case, 12 hours, everything else, we are willing to withdraw.

THE COURT: So, in essence, we're arguing about Schulof, GSM 4.83, and the IBM Simon Manual?

MR. CHAIKOVSKY: That is correct, Your Honor.

THE COURT: Okay. Anything further that you haven't already given me?

MR. CHAIKOVSKY: That -- that is it, Your Honor.

THE COURT: Okay. Then let's hear the flip side of this on the infringement contentions.

MR. BECKWITH: Your Honor, I think that's our motion.

THE COURT: It is.

MR. BECKWITH: I'm not -- I'm not sure --

I'm wondering why Mr. Bondor is coming to the podium.

MR. BONDOR: I had thought that Mr. Chaikovsky had already addressed it for them.

MR. CHAIKOVSKY: No.

MR. BECKWITH: No.

MR. CHAIKOVSKY: No.

MR. BONDOR: I had understood him to say that he was doing both of them, but I must have misunderstood.

THE COURT: Let's hear from Mr. Beckwith next.

MR. BONDOR: Your Honor, may I just address one thing? It's a correction.

THE COURT: Back on the earlier three that we were arguing about?

MR. BONDOR: Yeah, that's correct. I just want to bring to the Court's attention that -- that Mr. Chaikovsky is mistaken. This is the transcript from the February 1 -- oh, sorry, transcript from the February 1 hearing. Mr. Chaikovsky just said nobody talked about the manual. That wasn't true. I addressed it before Your Honor, saying, looking at Slide 4, this is how it comes up. The argument in their expert reports is a combination of the Simon device and the Simon user manual. And as Your Honor pointed out, they

didn't chart the device. They didn't chart this combination. The user manual and the device were both at issue, and Your -- Your Honor excluded both of them, notwithstanding, I think, the one line that Mr. Chaikovsky sought to give Your Honor.

THE COURT: All right. Let's -- let's move on. I'll hear from Mr. Beckwith.

MR. BECKWITH: Thank you, Your Honor.

If I could get to the slides that address Dr. Meldal's -- well, new opinions showing up for the first time in the amended infringement contentions.

The first thing I wanted to -- to raise on this point, Your Honor, is this is kind of an unusual situation because MMI only sought to amend their infringement contentions for a couple of issues, but their expert reports raise a lot of new undis -- previously undisclosed infringement theories. And -- and so what I'm going to address first is -- is specifically what they chose to try and put in through the amended infringement contention, but I also want to touch on the new infringement theory that only shows up in the expert report.

So the -- the first has to do with the '078 patent, Claim 70 -- 73. And when we put the claim up here to highlight two issues for the Court, in order for

there to be a proper amendment to the infringement contentions relating to this patent, it has to be motivated by the Court's construction. It has to be something that was not expected.

And what we have here is MMI trying to amend their contentions to inject into the case on the 11th hour this -- this thing called the video front end from the Qualcomm chip. It's also referred to in our papers, I think on both sides, as the VFE, the video front end. This is a specific portion of the Qualcomm chip that was never previously identified in the infringement contentions as being a basis for why we meet any element of Claim 73.

And so if we look at Claim 73, I highlighted here the two instances where there's a reference to a microprocessor and a means for processing that is contained within the camera unit. And what the claim clearly indicates is that there has to be two processors -- excuse me, two processors, the microprocessor and then in the camera unit a means for processing. And that's exactly what we said, and that was our position in connection with the Markman briefing.

The claim says you need two processors. In our Markman briefing, we said, you have to have a second

processor for the means for processing. So there's no way that MMI could come in and say, this was a surprise to me. The Court's construction was a surprise. It couldn't have been a surprise.

So what does that tell us? The first prong of can I amend the infringement contentions to add this video front end isn't satisfied because there's no surprise in the claim construction. The Court found two processors -- processors were required, and so the claim says -- and that's the -- what we advanced in our Markman argument.

So let's look at the second half of this question. Was there some new evidence that came to light that caused MMI to wake up and say, gosh, I couldn't have known about this video front end in the Qualcomm chip.

So if we can go to the next slide.

I've got a timeline here, the history of the video front end theory and the evidence that was disclosed. And what we see from this -- excuse me, Your Honor -- is in November of 2011, 13 months before they came up with this theory, the documents reflecting the video front end, the diagrams of the Qualcomm chip, everything you would need to know if you wanted to add the video front end into the case to say that's why you

infringe was all available in late 2011.

July 2012, MMI filed a motion to amend their infringement contentions, made no reference to the video front end. They made no reference to any of the evidence that they had in -- in hand about the details of the Qualcomm chip. They chose not to bring it in -- into the case. The Court issued the provisional Markman in August, and the final Markman in December. There was never an instance from the time that -- that MMI received the detailed information about the video front end back at the end of 2011 until they filed the -- their expert report that they had any intention whatsoever to rely on this feature of the Qualcomm chip. Excuse me.

And this in -- in some sense ties into what the Court has -- has carried, the motion the Court has carried about the importance of this Qualcomm license because MMI isn't telling us at any point during the course of fact discovery, hey, guys, it's the video front end in the Qualcomm chip that we claim is why you infringe. And now we're not able to get our hands on the license between Nokia and Qualcomm that would tell us do we have a -- a license perhaps to use that.

So going back to the -- one of the cases that we cite in -- in our brief, the Realtime Data case.

In the Realtime Data case, the Court denied a motion for leave to amend that had half the time of disclosure of -- of the -- the evidence that the party wanted to rely on. Here, MMI has had this information about the Qualcomm chip for twice as long. They've had access to our source code since September 2011. They -- they didn't choose to come look at it, but it was available.

The -- the point that -- that the Court focused on in the Realtime case was as a Plaintiff, you can't just sit back and let all the evidence pile up and then literally in connection with your expert report say, here's now my real case. Here's what I really intend to submit to the Court.

So in connection with the motion for leave -- I'm sorry, in connection with the motion to strike the amended infringement contentions, specifically relating to the effort on the part of Dr. Meldal to raise this new theory that the video front end of the Qualcomm chip is the means for processing, that should be stricken. It's not tied to your claim construction, and the information has been known for over a year.

If -- if we could skip to the next slide.

There was a -- a reference as well to the '075 patent, and Mr. Bondor was saying, you know, that's

been known to everybody, GSM, GSM, everybody knew what's going on with the '075 patent. I want to bring this to the Court's attention. This is actually part of our motion to strike the -- a portion of Mr. -- Dr. Meldal's expert report. The reason it's not a part of our motion to strike the amended infringement contentions is because MMI didn't put it in there. It's a brand new theory. It's a brand new theory that was never disclosed previously, and they didn't put it into either the original or the amended infringement contentions.

Now, this is Dr. Meldal saying, I'm now going to rely on what's called automatic call rejection. It's when the user doesn't have to push a button. You can pre-program your phone for a particular phone number. Somebody from that number tries to call you, the phone automatically rejects them.

Well, let's go to next slide, and we'll see this is what they put in their infringement contentions. They said, you infringe the '075 patent because the user slides or selects a red phone button. The user presses the red end call button to slide or ignore on the touch screen. This is the only disclosure that they had of why we infringe the '075 patent. It's the manual call rejection. No discussion anywhere about a completely

different function, automatic call rejection.

So we can't have automatic call rejection sneaking into the case, new theory, and it's not in the original infringement contentions. It's not in the amended infringement contentions. It's not in any of the infringement contentions. It only shows up in the -- in the expert report.

I just want to make sure that I'm not -- I did want to touch on something that Mr. Chaikovsky had referenced earlier about --

If we go to Slide 10.

Focusing in particular on the browser as being the universal data interface, there's no way that one could read the patent -- the '979 patent and think that a browser is a universal data interface. And when we look at the original infringement contentions, MMI referred to a structure. The structure is going to be this universal data interface. One cannot -- we certainly did not infer that when they were saying there's a structure that carries this data inter -- this universal data interface function out, that this structure was actually this undisclosed piece of software.

So I can read their initial infringement contentions. I can see that they're making a reference

to a structure being present that does this. I -- I would not have been prompted to say, they must be referring to a browser -- a piece of software that's doing it. I think the -- the two are incongruous, and I -- I did want to have an opportunity to -- to stress that.

Browser, not in the contentions. It's not referred to in the patent as being the structure that is a universal data interface. It's not referred to as -- as a structure at all. So those are the items that I wanted to -- to touch on for the -- in connection with our motion to -- to strike their amended infringement contentions.

THE COURT: All right.

MR. BECKWITH: Thank you, Your Honor. I don't know if the Court has questions.

THE COURT: No. Thank you, Mr. Beckwith.

Let me hear a response from the Plaintiff.

MR. MCDAVIT: Your Honor, I have a copy for you, more -- more slides to hand out.

THE COURT: Hand it up. I had thought we would be well into the Daubert motions and motions in limine by now. This is why we may need more time than I thought we were going to need.

Go ahead, counsel.

MR. MCDAVIT: Yes, Your Honor. I'm -- I'm going to try to be brief here.

If we can go to the -- yeah, the first slide.

Just to give you a background, the -- MMI served its amended infringement contentions in accordance with the Court's schedule. They were timely. They were -- expert reports were served on the 9th. Our amended contentions were served in accordance with your schedule on the 14th.

HTC, on the other hand, served an untimely motion to strike those. And I also note -- I want to pick up where I think Your Honor said, the -- the law is -- while the -- the original infringement contentions served a notice function to the Defendant, Defendants have an obligation also, if there is a problem with the original infringement contentions, to seek clarification. And there's -- there's case law in this circuit on the -- on the -- on that subject.

Can you turn to the next slide, please?

The Orion IP v. Staples -- I cite it for a different proposition here, but that case specifically says that Defendants can't lie in wait to clarify an issue until the eve of trial or until the pre-trial conference, as it was -- as it is here, to -- to say,

oh, all of a sudden we can't understand your contentions, because as I understand it, HTC wants it both ways.

If we hadn't done anything, they would have said our contentions are too vague and you can't enter any evidence. If we -- but by doing it, now they're saying, oh, we don't understand what your contentions are.

Our contentions were essentially clarified to provide the evidence that they provided to us during discovery. And in one case, they were -- they were amended to adjust for your construction of means-plus-function terms. So I'll go into that.

You can go back to the previous slide.

So we served infringement and expert reports on January 9th in accordance with the Court's schedule. We applied your -- our experts applied the Court's claim construction order, and we cited confidential information we received from HTC during discovery.

The next week, in accordance with the Court's schedule, we provided HTC notice that those reports that were served -- the expert reports also constituted infringement contentions in this case. So there's no question about it. This -- what our experts are saying, what our experts are relying on, those are

infringement contentions in the case.

Next slide, please.

In a sense, these aren't really for the most part amendments. They're citations to record evidence that came in the case that we received during the course of the two years of discovery from HTC.

Mr. Chaikovsky put up -- or, actually, I think it was Mr. Beckwith put up a slide showing the timeline in which they complained that time went by without us knowing anything. He didn't include things such as depositions we took of their engineers in Taiwan. I took a deposition of one of their engineers where he specifically pointed to the -- the VFE, called it a processor. Until that time, we wouldn't have that evidence.

Our infringement expert, Dr. Meldal, pointed to that evidence, that deposition testimony, as part of the evidence he has that their products meet the -- the claims of the -- of the '078 patent -- the -- Claim 73 of the '078 patent.

Providing the specific detail in our infringement contentions to identify areas of infringement, identifying record evidence that we now have after going through two years of discovery is expected under law. They provided source code to us.

If we didn't cite the source code, they'd come in here and they'd say, well, we didn't provide enough detail and they'd say our expert reports are deficient. It can't be that our expert reports are deficient because we provide them more detail of where they infringe.

Next slide, please.

With regard to the '078 patent, Claim 73, we changed -- amended our infringement contentions to adjust to a means-plus-function term construed by the Court and your Court's -- the Court's construction of camera unit.

Mr. Beckwith focused on the means for processing portion of the -- the claim construction order. But if you look also, the means for processing is part of the camera unit, a portion of Claim 73. And Your Honor construed camera unit, and if you look at our -- at our chart here, your -- your construction's on the right. It says, a camera constituting an individual functional constituent component of a whole personal communication device or of a whole portable mobile cellular phone. Well, that combined with the means for processing provided us structure that Dr. Meldal would be expected to identify that it's within HTC's products.

So using record evidence, confidential information that we did not have back in 2011, using

deposition testimony that we did not have access to in 2011, and using source code as necessary, we provided that detail in our infringement contentions.

Our experts did not change any infringement theories. Our 2011 contentions, you said, provide sufficient detail to put HTC on notice. HTC never came back and requested to strike the original infringement contentions. They never asked for clarification of the original infringement contentions.

MR. BECKWITH: Your Honor, this is -- I'm sorry to interrupt. This is a different motion. This is -- he's referring now to the motion to strike technical experts. We haven't gotten to that one yet.

MR. MCDAVIT: I can -- I can hold it back, Your Honor, or I can address it now. It's -- it's part and parcel of a lot of the same issues.

THE COURT: I want to hear about your response to their motion to strike your infringement contentions.

MR. MCDAVIT: All right, Your Honor.

Mr. Beckwith also talked about the '075 patent, showed a slide about automatic call rejection. Automatic call rejection is the subject of the '075 patent.

If you can switch to the ELMO, please.

I mean, it says right here -- I'll zoom in a little bit. This is the abstract of the '075 patent. When a call is incoming, identification information, including the incoming call, is compared with identification information contained in the rejection memory. When a match is detected, a rejection message is automatically sent by the mobile communication device to the transmitting station. So this is right front and center in -- in the abstract of the patent.

Second of all, HTC admits that those -- that that feature is within a subset of the phones that are accused of infringing Claims 5, 6, and 10 of the '075 -- the '075 patent. There aren't additional phones that are captured by this -- by this -- by the automatic call rejection that figures prominently in their phones. It's in their user guides.

And, finally, I'll note that their -- their expert doesn't dispute that this is -- that this is done by their phones. They don't dispute that the element where this comes into play, which is the determining element of the '075 patent, is met by the phones. There's no dispute over that.

So there's no need to -- to strike any portion of the report or strike the infringement contentions as to the automatic call rejection.

And, finally, I'll note that they -- they complain about the -- the use of the HTT browser -- HTTP browser for Mr. Cole's -- in Mr. Cole's report and in the infringement contentions for the '979. Again, this isn't a change in infringement theories. This is just additional detail to determine -- let the -- let HTC know what Mr. Cole did to get the files, the audio files, onto the phones so they can be played so he can explain the test that he ran to show why their phones infringe. This isn't a new theory. This is explaining what the expert did.

So by putting more meat on the bones that they never complained about the first -- first time, they can't come back here now and say, oh, we're surprised. These things were in our expert reports, they were addressed by their experts, and they are simply updating our contentions to show the details that we learned of dis -- in discovery that we did not have access to in 2011 when the notice contentions were filed.

THE COURT: All right. Thank you, counsel.

We've been going at it since 9:00 o'clock this morning. I've got a brief hearing at 1:30. We're going to recess. I'll hear additional argument, and we'll take up some more of our pre-trial litany of

things to do at 2:00 o'clock.

Now, before we break for lunch, do you have something on this motion to strike infringement contentions that I haven't heard before, Mr. Beckwith?

MR. BECKWITH: Your Honor, there were a couple of very quick things I wanted to -- in response.

THE COURT: I want to get that done. I'll consider that over the break, but it needs to be very quick, counsel.

MR. BECKWITH: Okay. If I can zoom out on the ELMO. Your Honor, this --

THE COURT: You all can practice later. Let's go ahead.

MR. BECKWITH: This refers to Exhibit D. It's a -- it was an exhibit that was provided in opposition to our motion, and I just went through and -- and with a little sticky, I just wanted to point out when this material was actually produced because what Mr. McDavit was saying is that they base their contentions on publicly available information, and I implore the Court to -- to keep the Realtime Data case in mind.

The -- the -- the information that was provided to them that they're relying on to support their contentions, this was produced December of 2011 --

December 2011. And the very top here, January 2012. This -- this stuff was in their hands for a long, long time. And Realtime Data says, you can't just sit on it and wait. You got to do something with it. You got to amend your contentions.

Same thing with the deposition testimony. They sat on it, and they waited. So the -- the other comment about the automatic call rejection, there might be a lot of embodiments described in the patent. What matters is what you put in your infringement contentions. And the infringement contentions pointed to manual call rejection, not the separate embodiment of automatic call rejection.

Those were the only other comments I wanted to make. Thank you, Your Honor.

THE COURT: All right. Thank you, counsel.

Well, as usual, both sides have argued that the other side has dirty hands, and to a certain extent, you're both right. I'll consider these matters over the break, try to give you a ruling on that when we get back. And given the slow pace of things, we have not made enough -- enough progress to break the pre-trial for today, so we'll reconvene at 2:00 o'clock or shortly thereafter, depending on my 1:30 hearing. And we'll go forward at least further than we are right now. We'll

stand in recess until 2:00 o'clock.

COURT SECURITY OFFICER: All rise.

(Recess.)

COURT SECURITY OFFICER: All rise.

THE COURT: Be seated, please.

All right. We'll return to the pre-trial hearing on the MMI/HTC case.

When we recessed, the Court had heard lengthy argument from the parties on Plaintiff's motion to strike certain invalidity contentions or references of the Defendant and the Defendant's motion to strike Plaintiff's infringement contentions -- amended infringement contentions.

Over the recess, the Court has considered the parties' arguments, looked at the transcript from the February 1st hearing, and on these two matters, my ruling is as follows: On the Defendant's motion to strike Plaintiff's infringement contentions, that is denied as to each of the contentions objected to by the Defendant.

On the Plaintiff's motion to strike Defendant's amended invalidity contentions, that is granted as to the IBM Simon manual. It's granted as to Schulof '541, but the Court denies the Plaintiff's motion to strike Defendant's invalidity contentions as

to GMS 4.83, not because there was any legitimate surprise post-claim construction on 3-6, but because that corresponds very closely to the infringement contentions that Plaintiff has put forward.

All right. I next would like to take up the parties' respective motions in limine. We'll start with the Plaintiff's motions in limine.

Let me ask, has there been any recent agreement between the parties as to any of these motions in limine? Are they all disputed, and we all need to go -- need to go through all of them? I'm guessing there have not been any agreements, but I wanted to ask.

MR. BONDOR: There hasn't been any agreement beyond, Your Honor, the parties' joint notice regarding the motions in limine which have some of -- of April 18th, which have some partial agreement with respect to certain of them, but not beyond that.

THE COURT: Okay.

MR. LIN: Your Honor --

THE COURT: Yes, sir.

MR. LIN: -- if I could just address -- Hong Lin with McDermott Will & Emery -- for MMI's Motion in Limine No. 6 regarding improper expert testimony, the parties have previously reached agreement as to two of the four areas of testimony that MMI objects to. And

for the remaining two, HTC agrees that our experts will not provide further testimony on those two points. I think MMI's Motion No. 6 is moot.

THE COURT: What you're telling me is Plaintiff's Motion in Limine No. 6 is effectively granted by agreement?

MR. LIN: That's right.

THE COURT: All right. Well, we can -- is there any -- any lack of understanding about what that is? Plaintiff's clear on that?

MR. BONDOR: Well, I think that our -- our -- our motion is clear on what it asked for, and I'm hearing they consented it -- to it, so I don't have any misunderstandings at this point in time, Your Honor.

THE COURT: Okay. Then I'll show Plaintiff's Motion in Limine No. 6 is granted by agreement.

All right. Then let's turn back to Plaintiff's Motion in Limine No. 1. This has to do with communications or actions of the Patent Office on currently pending or open re-examinations of the patents-in-suit.

I want to hear from the Plaintiffs since that's their motion in limine.

MR. BONDOR: Your Honor, may I ask -- I'm

sorry to back up just for one issue. When -- when we say Motion in Limine No. 6, that is, in fact, improper expert testimony, including testimony concerning undisclosed or untimely disclosed theories and testimony? I think --

THE COURT: That's what I have as -- listed as Item 6.

MR. BONDOR: Okay.

THE COURT: Is that -- is that -- just to make sure, is that what the Defendant has listed as Item 6?

MR. LIN: That's correct.

THE COURT: Okay.

MR. BONDOR: So against that backdrop, there is still a pending motion to strike certain issues associated with their expert reports that are, for instance, related to inequitable conduct and some other things. I just want to make sure that --

THE COURT: We're not dealing with the Daubert motions now.

MR. BONDOR: Okay. Or the motions to strike?

THE COURT: We'll deal with them separately.

MR. BONDOR: Okay. Thank you, Your Honor.

THE COURT: Okay. Then let's go back and

take up Plaintiff's Motion in Limine No. 1 with regard to actions or communications with the PTO regarding pending and open re-exams of the patents-in-suit.

MR. BONDOR: Your Honor, with respect to MMI's Motion in Limine No. 1 about pending re-exams, I think that I can be brief.

As identified in the case law both cited in the motion in limine, as well as the prevailing views of Courts throughout the country, based on the Federal Circuit's opinion in -- in on Hoechst Celanese versus BP Chemicals, the existence or the grant of a re-exam is not probative of invalidity according to the Federal Circuit.

Time and time again, including this Court in -- for instance, VirnetX versus Apple and VirnetX versus Cisco, Judge Davis in another case in, for instance, Boston Scientific versus Cordis, the Courts have determined -- and there are others that are cited in our -- in our briefs -- that trying to explain to a jury the import or context for an ongoing re-examination procedure is unduly confusing. It is hard for a jury to understand non-final interim actions or the pendency of an existing unclosed re-examination.

There is a substantial risk that if the jury hears about interim actions or about re-examinations at

all that they will dilute the presumption of validity that attaches to the patent as a matter of law, regardless of the existence of the re-examination proceeding. And on that basis, we urge the Court to preclude any evidence or argument at all related to any open re-examination proceedings.

I make that argument and want to be careful to distinguish from closed re-examinations in which re-examinations were denied or in which re-examinations confirm the patentability over yet additional prior art. We have several instances of that in that case, and those confirmations simply become part of the prosecution history. There isn't anything live or different, so in Plaintiff's view, that -- and indeed the Court's, including PharmaStem Therapeutics versus ViaCell and -- and even Volterra versus Primarion recognized that closed re-exams are fair game for trial, but open re-exams are not.

THE COURT: All right. Response from the Defendants?

MR. CHAIKOVSKY: Thank you, Your Honor.

In -- in light of Plaintiff's pursuing a willfulness claim, and at this point, we don't know, I guess, what evidence with respect to that willfulness claim will be allowed, Your Honor, there are cases that

we cited in our briefing, TGIP versus AT&T that -- holding as a matter of law that Defendant had not willfully infringed claims of two patents-in-suit, where one of the patents were not on the re-exam, but the USPTO required changes in the patent. And whether those changes are occurring in an issued re-examination or a pending re-examination, that would be relevant.

And also following that case, citing that case, Plumley versus Mockett, while a substantial question of patentability raised by re-examination is not dispositive in a willfulness inquiry, it certainly -- certainly relevant. In fact, saying a patentee's willful infringement claims fail as a matter of law, that the PTO requires amendments to the patent before issuing a re-exam certificate, and I put that up -- if you would put the slides up on the -- thanks.

It is -- there are many re-exams with respect to -- and if we look at the -- the four patents that we have at issue here, three out of the four actually have pending re-examinations, Your Honor. And I'll break down who has issued while still also pending. We wouldn't be talking about it if it was just pending. It would be issued and pending.

And so -- so, for example, in the top, what we've shown is in the '075, which is obviously a patent

that they're pursuing here, they argued for a narrower interpretation of immediate release to overcome prior art recently to the Patent Office. In fact, they cited the Delaware District Court's claim construction in overcoming prior art.

And, you know, in so doing, that's MMI taking a factual position, you know, FRE 801(d)(2)(a), and, you know, following Spectrum versus Sterilite that opposing counsel argued in terms of using statements by a patentee or PharmaStem versus ViaCell, that are inconsistent, here we have a situation where they're going to come into court with an expert witness about what means immediate release, at least based on, you know, what's allowed -- depending on what's allow -- their expert's allowed to testify to under the GMS standard. And that a timeout, for example, could possibly be an immediate release, even up to five minutes possibly, where that is not the position that is being taken to overcome prior art before the Patent Office.

And so you have MMI taking these inconsistent positions here in this courtroom versus the Patent Office. This has nothing to do with the Patent Office's interpretation or what the PTO has done.

I've read your opinions with respect to it's not final until it's final. I don't know when it's final. And I'm not disagreeing with that, but we do have them in particular with respect to the '075 taking potentially inconsistent positions. And so we're not saying we want to present it, per se, but if they're going to take inconsistent positions, we should be allowed to rebut those inconsistent positions with their admissions to the Patent Office, whether in a pending action or an issued action.

THE COURT: Well, clearly, counsel, the Court's granting of a motion in limine is not an ultimate and final refusal to accept that evidence. It's merely an obligation that before you go into it before the jury, you have to approach and obtain leave of the Court.

I do see that there is a potential for prejudice. And out of an abundance of caution, I'm not telling you I'm going to exclude it, but I am going to require you to approach and get leave before you go into it. And if it is relevant and if it does contradict something that they've said differently, in all likelihood, you're going to get leave, but you're going to have to approach and get leave first.

MR. CHAIKOVSKY: That's all that we ask,

Your Honor.

THE COURT: That's the ruling on Plaintiff's Motion in Limine 1.

MR. CHAIKOVSKY: Thank you, Your Honor.

THE COURT: All right. Plaintiff's Motion in Limine 2, this has to do with similar type communications on continuations or divisional applications. And if I granted 1, you can guess what I'm going to do on 2, for the same reasons.

MR. MCDAVIT: Your Honor, it's a -- it's a similar issue, and I think it also folds into, you know, we're going to try the patents here in -- in this suit. We're not going to be trying patents that are being ongoing prosecution.

I also want to address while I was up here, if it so pleases Your Honor, because it relates to the same issue, our Motion No. 11 which has to do with claims and patents that are no longer in this case.

THE COURT: Let's take them one at a time, counsel.

MR. MCDAVIT: Absolutely, Your Honor.

THE COURT: All right. The response from the Defendant.

MR. LIN: Your Honor, our response for Motion in Limine No. 2 is similar to our response for

No. 1. As this Court has held in Rmail versus Amazon, citing to a Federal -- Federal Circuit case Microsoft versus Multi-Tech Systems, the statement made by a patentee under the prosecution history of the patent in the same family can operate as a disclaimer.

And what we have in this case is in one instance at least, the '078 patent has pending continuations. And HTC doesn't intend to present evidence of statements made during prosecution to suggest to the jury that issued claims are invalid. But during the continuations, MMI has characterized prior art references that our expert may opine on. And if MMI's expert takes an inconsistent position with respect to the prior art reference, then we want to point that out to the jury.

In addition to some of these continuations, MMI also characterizes claim terms from the asserted claims. And if MMI takes a position on the scope of that claim term, we'd also want to present that to the jury.

THE COURT: Well, the Court's ruling is similar to the ruling on No. 1. There's even less of an argument for probative value here than there is with the patents-in-suit, but I'm -- I'm going to grant the motion in limine. However, if you think there's a -- a

relevance issue, if you think the door has been opened, if you think that they've taken an inconsistent position and you want to approach and seek leave, you're certainly open to do that.

MR. LIN: Thank you.

THE COURT: All right. Plaintiff's Motion in Limine 3 that MMI is a litigation shell of Sony and Nokia, otherwise controlled by Sony and Nokia.

Let me hear from the Plaintiff on this one.

MR. BONDOR: Your Honor, as -- as the Court knows from its review on the motion to dismiss and on the briefing, on multiple occasions HTC has, you know, stated that MMI is controlled by Sony or Nokia. As a factual matter, that is incorrect. Both Sony and Nokia, even if one were going to ignore all of the corporate forms, which MMI feels would be inappropriate, they are minority owners only, and, therefore, you know, any comment that -- that MMI is a litigation shell or is controlled by Sony or Nokia should not be permitted. They are prejudicial to MMI and would go against 403.

THE COURT: All right. Response from the Defendant?

MR. MCMAHON: Yes, Your Honor. Thank you, Your Honor.

We've heard a lot about the corporate

documents. There's a set of four different corporate documents that describe the formation and how they move forward with this. The truth of the matter is four of the -- the seven board members are from Nokia and Sony, so they have significant control.

And we believe that we should be able to tell the jury for cross-examination purposes, for bias purposes, and to flesh out the case, the relationship between the companies. And it's not clear what the Plaintiff is asking for here. But at the end of the day, we have a right to discuss what their formation is like and the control, such as it is, and we need to be accurate, that Sony and Nokia can exert on MMI here.

For instance, the wholly-owned subsidiary of -- of MPEG LA is the one that receives and doles out all of the royalties. So there -- there are -- the way they've set this thing up, Your Honor, it -- it's hard to tell who's on first, and we've got the right to be able to go into that with the jury.

THE COURT: Well, you're going to hear this from me on several other of these motions in limine. Evidence as to the facts is permissible. Characterizations are not. The Defendant's not going to call MMI a shell. You're not going to use any disparaging language. And if in doubt, don't. I don't

want you to get close to disparagement. However, I agree that the facts regarding the manner in which MMI was created and how it's structured by those who put it in place, those facts are fair game.

MR. MCMAHON: Yes, Your Honor.

THE COURT: But just the facts, no characterization.

MR. MCMAHON: Thank you, Your Honor.

THE COURT: And quite honestly, it's the same ruling with the same analysis for No. 4. No characterization, no disparagement, but an indication of what the facts are is what lawsuits are about, and we'll let the jury decide.

MR. MCMAHON: Thank you, Your Honor.

THE COURT: Did I jump ahead of you, Mr. Bondor?

MR. BONDOR: No, Your Honor. I -- I was trying to figure out which of these actually needed to be addressed immediately or if any of them could be, if you will, provisionally granted and -- and maybe we could limit the numbers that -- that we need to argue before Your Honor. But we're -- we're making good speed, so we can just continue as Your Honor has.

THE COURT: Thank you very much.

MR. BONDOR: I'm sorry, Your Honor. That

came out entirely the wrong way. I'll sit down and shut up now.

THE COURT: That's a better choice.

All right. Let's go to No. 5. This is Plaintiff's motion in limine regarding Sony or Nokia's lack of involvement or reluctance in the participation of the lawsuit. I've ruled on the standing argument. That motion in limine is granted.

6, you've indicated that that's granted by agreement, so I'll note it as such and move on.

Plaintiff's Motion in Limine 7 has to do with HTC's patent license, non-comparable licenses, or patents related to those licenses.

Let me hear from the Plaintiff on this one.

MR. PACKIN: Good afternoon, Your Honor. Tamir Packin for Plaintiff MMI.

So what we're dealing with here are three specific license agreements that the -- HTC's expert, Mr. Bakewell, relies on in forming his opinions. What he essentially does is he -- he's trying to put low lump sum numbers in front of the jury.

I think one of these actually falls out because it relates to patents that are not going to be tried in this case, and that's the SP Technologies license. They had Dr. Jeffay say that that license was

comparable to the '887 and '760 patents which are not going to be tried, so I'm not going to waste time discussing that one unless they come back and say they are planning on introducing that license, so I'll focus on the ones that actually purport to relate to patents that are going to be tried in this case, and that's the 2010 Minerva Industries and HTC licenses and the 2010 ADC Technologies and HTC license.

And essentially what those -- the analysis that the -- Dr. Grimes does, he purports to do an analysis to show that they're comparable in order to satisfy the Federal Circuit's requirement of comparability in order to put those low numbers in front of the jury.

And if I could just put his report up on the -- on the ELMO.

So this is the whole portion of Dr. Grimes' report where he does any sort of comparability analysis, and all of the license patents in both of those patent licenses he says are comparable to the '078 patent. So essentially he has three sentences here where he basically says, these patents, you know, generally cover the same general field. So, for example, with the '783 and the '120, he says, their claims cover a mobile entertainment communication device that includes a

camera for recording images that can be wireless -- wirelessly transmitted or either selectively or automatically.

The other one's similar. It's a one-sentence thing that's not the type of comparability analysis. And when we asked him at his deposition --

THE COURT: This is not a Daubert motion, counsel. I mean, I'm not arguing proper analysis or --

MR. PACKIN: Well, so -- that's right, Your Honor, the motion is to keep out the particular license agreements, and the only purported relevance of the license agreements is to Mr. Bakewell's analysis. So what I'm trying to show you is that the prejudicial nature of the license outweighs the relevance. It's not a Daubert motion.

THE COURT: Okay.

MR. PACKIN: The point of the -- so what -- what -- what Dr. Grimes says -- I mean, the totality of it, you know, we asked in his deposition: Did you even do any sort of analysis to see whether or not these patents also cover the same technologies, the same devices as the '078 patent? He said he never did that. He doesn't know what the number of units are. So then the purported relevance of it is that Mr. Bakewell gets up, takes this million dollar number, takes a two

million dollar number, divides it by all of HTC's unit sales, 97 million units to get one cent per unit, two cents per unit, and they're just trying to throw low numbers in front of the jury. It's improper. There's nothing relevant here. And so -- and it's highly prejudicial to us because we're asking for, you know, significantly more than one cent or two cents per -- per unit.

THE COURT: All right. Let me hear from the Defendants.

MR. ALBERTI: Thank you, Your Honor.

This is -- this subject will be covered in the Daubert that we'll be touching in a few minutes. It -- it lays over our Motion in Limine No. 1 and my response to Motion in Limine No. 8.

Subject, comparability in patent litigation. Comparability, as Your Honor knows, requires both technologically comparable and economically comparable. We submit -- although they think that's deficient -- at least the experts -- at least the technical experts for HTC did some review. That jury can watch cross-examination to see if they believe that that's sufficient.

Number two, in terms of what Dr. Grimes did, and I'll just take counsel's word for it that the

patents they dropped out this morning impact the SP or the first -- first license that they tried to knock out, but what Dr. Grimes did and what was done on the second patent, which was related to the ADC/HTC license, I submit is fitting all of the requirements of comparability. Whereas, we'll see in a few minutes with my Motion in Limine No. 1 and most importantly my Daubert motion, that absolutely, without any doubt, Plaintiff has not followed the rules of the Federal Circuit, the rules of this District Court in reference to comparability.

So I realize I'm getting a little into Daubert, and I'll wait for that, but I would submit to the Court that this motion in limine should not be granted and that if the Court has any further questions, I'm sure they'll come up in the Daubert.

THE COURT: In other words, you want theirs denied, but you want yours granted?

MR. ALBERTI: For a very important fundamental reason, yes, yes, because not one of their technical experts, not one ever, ever did any analysis. And, finally, Mr. -- Dr. -- Mr. Sims, who will now be on his fifth -- fifth damages report, the only thing he did was after his second report on March 4th of 2013 and his third report, he went and said, it's comparable because

it's in the smart phone space. And we know under Lucent and good common sense that's insufficient to show technically comparable and -- and economically comparable.

So, yes, I do want theirs to absolutely be Dauberted out and ours should be submitted for jury review because we actually did engage experts. They may not think the expert did a great job, but we took the proper fundamental steps under Lucent and LaserDynamics.

THE COURT: All right. Well, noting that this is not a Daubert motion hearing and that that will stand or fall on its own merit at a later time, I'm going to deny Plaintiff's Motion in Limine 7.

No. 8, whether HTC is a Texas company. We're not -- we're not going to reargue the venue matter, counsel.

MR. HEARTFIELD: We -- we agree. We're not going to refer to HTC as a Texas company.

THE COURT: Well, then I assume we can grant this by agreement?

MR. HEARTFIELD: That will be by agreement, yes, sir.

THE COURT: It will be granted.

Don't mean to cut off a young lawyer from getting a chance to --

MS. STEMPLER: Thank you.

MR. BONDOR: She won, Your Honor. That was great.

THE COURT: She was so good, she didn't even get to the podium.

Okay. No. 9, invalidity based on untimely disclosed or undisclosed prior art references.

Now, that's one that I certainly think is going to rise or fall with the Daubert motions. And this is why -- I'll -- I'll hear from the Plaintiff on it, but this is why I said early on, both sides are going to need to stick to their experts' reports and not go outside of them.

All right. Let me hear from the Plaintiff on this.

MR. MCDAVIT: Your Honor, I don't know that we have a whole lot more to say than -- than what we've already discussed in terms of the motions to strike the invalidity contentions and infringement contentions. And with your ruling on the motions, our -- our motions to strike HTC's invalidity contentions and the remaining references that are there, I don't -- I don't know there's much more to say about this MIL.

THE COURT: It seems like to me this is probably mooted by what we've already done.

MR. MCDAVIT: I believe so, sir.

THE COURT: Defendant disagree?

MR. LIN: We agree it's mooted.

THE COURT: All right. Well, for the purposes of the record, I'll show it denied as moot. I think everybody knows where we stand.

All right. Next is Plaintiff's Motion in Limine 10.

Let me hear from the Plaintiff on this. This is the one where the Plaintiff doesn't want the Defendants to say they obstructed the discovery process.

MR. BONDOR: Your Honor, I -- I think that it won't come as a surprise to you that, you know, we have seen various verbiage in HTC's briefs to Your Honor and to the Court that -- to the effect that MMI is a litigation shell, and -- and MMI was structured by Nokia and Sony and is a puppet of Nokia and Sony and was set up so as to avoid discovery obligations.

I think that the actual record of this case demonstrates that MMI complied with its discovery obligations, that -- that HTC took discovery from -- from both Nokia and Sony directly, that when they wanted additional discovery as an informal matter, we went at the Court's direction and got that accommodation from Nokia and Sony. There -- there is no basis for them to

assert that MMI obstructed discovery in any way, and we ask for the MIL to establish that.

Going into this, it's my understanding, I don't believe that there's any dispute with respect to that, and I thought we were near agreement on that MIL, as well.

THE COURT: Defendants?

MR. BECKWITH: Your Honor, I think that this would fall in the category of what the Court has said that it was going to carry concerning the production of the Nokia/Qualcomm license. We would suggest that this be carried, as well, until that is determined.

In addition, as I understand it, the limited nature of this in any event is directed exclusively to whether MMI has obstructed the -- the discovery process, and it's our belief that if someone has a problem with discovery, if there's a granting of a ruling or denial of a ruling, that that's not something that would be presented to the jury.

The Court has ruled on that, and we're not going to rehash for the jury, you know, I brought five motions to compel and three were granted and two were denied. So it seems to us that if -- if it goes both ways and nobody's going to be talking in front of the jury about what discovery they did or didn't get,

then -- then we would suggest that with that narrow exception of what we pro -- proposed to be carried on the Nokia/Qualcomm agreement, that -- that it -- that it go both ways.

THE COURT: And it's going to go both ways. For the record, though, this Motion in Limine 10 for the Plaintiff is granted.

The fact that the Court's carried the actual order to produce certain documents doesn't go to the motion in limine. Neither side is going to refer to discovery disputes or imply, state, or communicate otherwise that the other side has obstructed or abused the discovery process.

Mr. Beckwith is exactly right, discovery issues have been brought to the Court. They've been ruled on. If they haven't been brought to the Court, by the time we get before the jury, they're waived and irrelevant. We're not going to talk about discovery problems.

And the Defendant's comparable motion in limine will be granted for the same reason. But we'll get to that when we get to that.

All right. Next is Plaintiff's Motion in Limine 11.

MR. MCDAVIT: Your Honor, this is just --

this is to exclude. As you know, when this case started, there were 12 patents in the case and there were some 40 some odd claims. Here we are, we're going to be trying a case to the jury that we -- through the process of going through discovery, through the process of narrowing based on your recommendations and -- and your decisions, we're here.

So we just want the patents in this suit to be tried and the claims in this suit to be tried, and any evidence of any claims that were prior -- previously asserted and -- and no longer in this case or any patents that were previously asserted and no longer in this case are not relevant to the issues that are being presented to this jury, and the fact that they are no longer in this case might mislead the jury and would be prejudicial.

THE COURT: Let me ask you this, counsel. I understand that certain specified patents and the related claims were severed out this morning, per the Plaintiff's request. That's already been done, but prior to this morning, there were patents and claims that were dropped. And my question is, the '239 patent and the '012 patent have been dropped by Plaintiff?

MR. MCDAVIT: Yes, Your Honor.

THE COURT: Are there live and pending

counterclaims by the Defendant as to those patents, and have those counterclaims been dropped, or are they still in this case? What's your understanding in that regard?

MR. MCDAVIT: My understanding is that the Defendants -- they submitted expert reports -- invalidity reports on those two patents, and so those counterclaims, to the extent that they want to -- that leads me to believe that those counterclaims are still live, though, I haven't seen any evidence since that time that they were going to go forward and press those counterclaims here at trial.

THE COURT: All right. Let me hear from the Defendant on this.

MR. CHAIKOVSKY: Your Honor, you want me to address the issue you raised first?

THE COURT: Yes.

MR. CHAIKOVSKY: Well, they've dropped those -- those claims as -- as you've said, the '239 and the '012. We did have and do have DJ counterclaims that we've carried forward.

THE COURT: Are those going to be a part of this trial?

MR. CHAIKOVSKY: Well, we've asked for a covenant not to sue on those patents. They've -- they've denied granting --

THE COURT: Yeah, I didn't ask you that. Is it really going to be a live part of this case?

MR. CHAIKOVSKY: Your -- Your Honor, given the time limits involved, no, we -- we'd probably ask that similar to what they've done -- I mean, if we want to sever those out, we'd be happy to -- to have those severed out.

THE COURT: I mean, we're not going to talk about patents that are not asserted that have been dropped previously, but if they've dropped patents that you have live counterclaims on, I can't -- there dropping their patents doesn't drop your counterclaims. So that's why I raised the issue. But if your counterclaims really aren't going to be a part of this lawsuit, they need to be treated the same way. If they are, then that's different. That's what I'm asking for guidance from you on.

MR. CHAIKOVSKY: So -- so can I -- can I raise one issue that I think goes along with the mentioning of the dropped patents, irrespective of how the counterclaims are -- are -- are handled, Your Honor, which is that they're -- they're going to bring the -- their willfulness story, whatever portion they're allowed to bring in, but we'll see the letter that has 50 plus patents in it. We see the complaint that has --

I don't know how we're going to hide from the fact that the complaint has 11 patents in it. We may be only trying four patents, but the complaint has 11 patents.

What will be the story with respect to -- what will be the story the Plaintiff provides with respect to the remaining seven patents, they may be able to say a certain portion of those were severed, but three of them were not. Two of them were dropped sua sponte by Plaintiff. One of them you found invalid for indefiniteness.

THE COURT: Uh-huh.

MR. CHAIKOVSKY: Why should we -- in saying we were not objectively or subjectively reckless under Seagate, why should we not be able to mention our success against the '170, in particular, with respect to indefiniteness? And, quite frankly, I think based on discovery that it is shown that they decided not to pursue in expert reports the '239 and the '012.

So irrespective of our DJ counterclaims, which, again, we could sever out into a separate action, I think the fact that they're going to bring a complaint that mentions 11 patents into this case as a basis for willful infringement -- at least that's in their interrogatory, the other evidence is not that they'd like to bring -- allows us to point out what happened to

3 of those 11 patents.
THE COURT: All right. Now, what's the answer to the question as to whether your counterclaims are going to be actively litigated on the '239 and the '012 as a part of this trial?
MR. CHAIKOVSKY: I do not want to litigate on this part. We would ask that they be severed into a separate action, also, as you dealt with their other patents that are in litigation, Your Honor.
THE COURT: What's the Plaintiff's response to this request from the Defendant?
MR. MCDAVIT: We don't have any issue with the severing of those, Your Honor.
THE COURT: Then when the joint motion to sever we talked about earlier is submitted, cover these counterclaims only on these two patents. But otherwise, I'm going to grant the motion in limine.
We're here to -- we're here to litigate these patents that are in suit. And, again, the motion in limine is not a permanent barring of the evidence. It's just you're going to have to show me the reason and the relevance before you launch into it, okay?
MR. CHAIKOVSKY: Thank you, Your Honor.
THE COURT: All right. We'll next turn to the Defendant's motions in limine, and we'll hear the

non-comparable license issue again from the Defendant's standpoint.

MR. ALBERTI: Your Honor, I will be very brief because, frankly, this is part of our Daubert, and as Your Honor just guided us and has guided me, everything I'm going to say in a few minutes in the Daubert would be replicated here. I will show you all of the fralities, deficiencies, and improprieties of their comparability attempt, but I want to -- the Daubert because it should be excluded.

THE COURT: All right. Anything from the Plaintiff on this?

MR. PACKIN: Yes, Your Honor. We agree that it should be taken up at Daubert in light of Your Honor's guidance, but in light of that, it should be denied just like Plaintiff's similar motion --

THE COURT: And for motion in limine purposes, the Court denies Defendant's Motion in Limine No. 1.

Next, settlements or verdicts in other lawsuits, particularly MMI versus Apple.

MR. ALBERTI: Thank you, Your Honor.

Regarding No. 2, I'm assuming -- and I'll seek to have this concession frankly on the record, that three of the four issues that we are raising in this

motion in limine, specifically the Apple/Samsung verdict, prior verdicts through witnesses that as Mr. Bakewell was examined about the way patent cases can produce big numbers, and the HTC settlement of other litigation, the Apple versus HTC settlement, basically Plaintiff did not vie with those three in the opposition. So I assume what we're really talking about is the MMI/Apple verdict and what they would like to do with it.

Let me direct my attention to that. The MMI/Apple was a case -- was a verdict, and it is a verdict. And that's all it is right now. There isn't anybody in this courtroom who can say that they tried a case to a jury, went home and told their spouse, I won, and found out later either through post-trial motions or appeal, in all due respect, they didn't prevail.

So the idea that they have cited a case, Mendenhall, that they believe gives them liberty to go to a court -- excuse me, and a jury and prejudice that jury with something that's not even fully baked is on its face improper.

So I submit that no evidence relating to the MMI/Apple case, even if you want to try to squeeze it into this willfulness opening, is -- is appropriate. And I would submit it on that, Your Honor.

THE COURT: Let me hear from the Plaintiff.

MR. BONDOR: I'm going to address all three issues raised by the motion, Your Honor, but I'll start with the -- with the Apple case. The Apple case is, in fact, evidence that is secondary -- secondary consideration of non-obviousness, commercial success, and use by others. The Apple verdict and judgment represents confirmation of the patents as being used by Apple. They are secondary considerations of non-obviousness in this case for that reason. They are equally relevant to issues of inducement and issues of willfulness given that the Apple case and the invalidity cases that were tried in the Apple case were for all intents and purposes on the same references that HTC apparently intends to go forward here. Therefore, evidence of the Apple verdict and judgment are, in fact, relevant.

With respect to the other issues about the HTC/Apple license, the HTC/Apple license and any cross on the HTC/Apple license or settlement, I would beg -- beg Your Honor's indulgence to postpone argument on that until we actually get the license, and we obviously are very much interested in getting that license.

And with respect to Mr. Bakewell's considerations and the statements that he's made and the

positions that he's taken in other cases, that is relevant and fair cross for his credibility as a -- as an expert witness, and that should not be excluded either.

THE COURT: Well --

MR. ALBERTI: May I have a brief response, Your Honor?

THE COURT: Very brief.

MR. ALBERTI: Thank you.

Number one, on Apple, different claim construction, different court.

Number two, I don't believe there's a judgment. The damages have been severed. Completely different matter.

And in reference to the fact that a case that's two to three months over, the jury in Delaware was only -- I think it was two months; is that right? Yeah, it was December. To think that you could walk into another court in our land and start trotting out something that I'll called half baked is just wrong. Whether it's 403 or common sense, it just doesn't belong in your -- in your trial. Submitted.

THE COURT: Well, you'd trade where you are today for a verdict in your favor, wouldn't you?

MR. ALBERTI: What's that, Your Honor?

THE COURT: I said, you'd trade where you are today for a verdict in your favor in this case, wouldn't you?

MR. ALBERTI: Your Honor, I -- I follow the wisdom of the Court, and as much as I like to try jury trials, one day at a time, Your Honor.

THE COURT: All right. Well, the Court's going to grant Defendant's Motion in Limine No. 2. The Court's going to make it clear that that's not an ultimate exclusion of the evidence for all purposes. But because of the high probability for prejudice in the Court's view, the Plaintiff is going to have to approach and get leave before they go into it.

All right. 3 -- Defendant's 3, economic terms of the MPEG LA licenses.

MR. ALBERTI: Thank you, Your Honor.

Again, this motion in limine weaves into the fundamental laws on comparability. It's clear, just as I think counsel's alluded to, claiming that we are trying to get in what they call low ball licenses where we did do a test, we did go through a technical expert, and we did prove -- we did -- we believe we submitted economic comparability.

In this case, they basically take a different entity, MPEG LA, that everybody knows is a

totally different technology from what is before Your Honor. They take that subject of MPEG LA, the video compression technology regarding essential patents, and if somebody needs a further definition of what they do, Your Honor, they cited a case -- the DataQuill case against of all companies, HTC, a 2012 case. They cited it. And when you go to that case, you will find that the Federal Judge in California just a few months ago excluded reference to the MPEG licenses for the specific reason I'm addressing here. They are not comparable, let alone has there been any showing.

And the reason they want to do it is they want to show the jury that in this other land called MPEG LA, which is this data compression land, the range of licenses can go from 10 cents to $5.00. And, therefore, go to this jury and try to say, well, look how reasonable we are, assuming they make it through the Daubert hearing in a few minutes. And I submit, Your Honor, by taking the MPEG LA issue in terms of what their damage model -- excuse me, license models are, to try to jack up and -- and bolster their model here is just wrong. It's clearly an attempt to mislead the jury, to attach alleged significance to an MPEG LA licensing program that doesn't have anything to do with what's before Your Honor.

THE COURT: All right. What's the Plaintiff's position?

MR. PACKIN: Yes, Your Honor.

The argument I just heard sounded a lot like a Daubert argument on comparability, but that misses the point of the MPEG LA licenses. MPEG LA is one of the entities that formed MMI. So the story behind how MMI was -- was formed in terms of the factual story, Your Honor already said that Defendants could refer to that.

Plaintiff should be entitled talk about MPEG LA's licensing history and Mr. Horn's experience with MPEG LA's licensing history. That goes directly to how MMI's licensing policy for the patents-in-suit -- the patents that are in this case, for how that was formed, how did they come up with that, why did they decide to use a per unit structure?

So if the -- it doesn't have anything to do with comparability. What it has to do with is -- is allowing us to tell the -- the full MMI story, including who the companies are that formed it, why Sony and Nokia went to MPEG LA because MPEG LA was experienced in licensing, the type of structure of deals that MPEG LA was doing.

And so putting comparability aside, what Plaintiff should be allowed to do is tell that story to

the jury and explain to the jury how we got to where we are, how MMI's licensing policy was formed, and what it's based on because Defendants, I anticipate, are going to attack that policy as arbitrary and pulled out of thin air, and we should be able to present the jury with the facts behind it.

MR. ALBERTI: Very briefly, Your Honor, might I, please?

THE COURT: Very briefly.

MR. ALBERTI: Thank you.

Bottom line, attempt to go to that jury and tell the jury that this program that doesn't have anything to do with the technology that's before the Court is 403 like I've never seen it. The prejudice that could come from just dumping in dollars, $5.00 a license on something that doesn't have anything to do with -- or not even close to being comparable to the matter before the Court is just so highly prejudicial.

But, finally, Your Honor, what we're really talking about here is the fact that Mr. Horn, everybody knows it doesn't have anything to do with the MMI program. That's why MMI was created supposedly. MPEG LA is different, and you can't take what they do and then say, as long as we're telling the story about MPEG LA, let me tell you how much they license their products

for. Totally prejudicial. Far more prejudicial than probative. Submitted.

THE COURT: All right. This falls under much of the same category I mentioned earlier. I think the factual reality is fair game. It's subject to cross-examination. But I don't think it can be or should be or will be characterized as being negative or positive from either perspective.

As I denied Plaintiff's Motion in Limine 7, which the Defendants argued was an attempt to get in low ball numbers, I'm going to deny Defendant's Motion in Limine 3, which Plaintiff argues is the opposite.

So the facts themselves are fair game. It's being used to establish a historical track record, not for an absolute royalty calculation. But characterization of MPEG LA in any negative way or what's happened before, characterization is not permitted. But, otherwise, the factual realities, what's happened and how it's happened, are fair game and are subject to cross-examination. And the motion in limine in that regard is denied.

All right. That brings us to Defendant's Motion in Limine 4, suggesting a witness is not trustworthy or is dishonest based on their language, nationality, ethnicity, or referring to HTC as a Chinese

company.

MR. HEARTFIELD: Your Honor, I believe the parties are in three-fourths agreement on this one. MMI has agreed that they will not refer to HTC as a Chinese company. I think the parties both agree that we will not use nationality or ethnicity as a -- a way to characterize a witness as being dishonest or not trustworthy.

Where the dispute lies here is in the characterization of our Taiwanese clients' choice to testify at depositions using their primary language where they felt most comfortable and most accurate. So to first imply that they are -- they are not to be trusted or that they are dishonest because they have some limited or expanded knowledge of English but chose to speak and communicate in a legal proceeding using their primary language I think is a way to backdoor into this characterization, and that should not be allowed without first approaching the bench, Your Honor.

THE COURT: What's the Plaintiff's response?

MR. BONDOR: Your Honor, the -- it's a -- it's a very simple issue. At least five of the witnesses that were deposed in this action were -- were people who either went to undergraduate or had advanced graduate degrees in the United States from U.S.

universities who testified that they use English in their every day work at HTC, and despite their facility with English and their study and in some cases years of living here in the United States were choosing to testify through a -- an interpreter. And we think that under some circumstances, and I think it's probably easy or better to be assessed by the Court at the time that it happens during trial, but we think that that could be relevant in the jury's view to whether or not a witness is being forthright and open and relevant to their credibility. And -- and that's the only issue with this.

THE COURT: All right. Well, the Court's going to grant the Defendant's Motion in Limine 4.

If for some unimaginable reason, Mr. Bondor, you think that's relevant, you can approach during the trial --

MR. BONDOR: Thank you.

THE COURT: -- and secure leave, but this trial is not going to be about who uses an interpreter and who doesn't. And just for purposes of clarity, it's my -- it's my practice on deposition clips, you play the English. I don't need to waste the jury's time hearing the foreign language and then the interpretation of it. The response in English needs to be played. It makes it

much smoother, and it doesn't waste the Court's time.

This is not about what language a witnesses chooses to testify in, and we're not going to make that part of the trial. So Motion in Limine 4 is granted.

All right. No. 5, Defendant's 5.

MR. HEARTFIELD: That should be agreed upon, Your Honor.

THE COURT: Well, if it's not, it's granted. We're not going to talk about closing your Houston facility, dissolving your Houst -- or Texas corporation and reincorporating in Washington. You fought that fight on venue.

MR. HEARTFIELD: I just wanted them not to say that.

THE COURT: I understand.

MR. HEARTFIELD: Okay. Because I'm not.

THE COURT: I mean, does the Defendant -- excuse me, does the Plaintiff disagree?

MR. BONDOR: No, Your Honor.

THE COURT: Does the Plaintiff think there's some reason why you should talk about that?

MR. BONDOR: No, Your Honor. Unless they were to open the door by proclaiming themselves a Texas company or talk about their --

THE COURT: Right.

MR. BONDOR: -- employment as Texas citizens, it's not an issue at all.

THE COURT: And -- and that raises a valid point, Mr. Bondor. Some of these are offered on the basis of whether they might open the door. We're not going to take up motions in limine and grant them on the basis of they might do this, they might do that. If they do, then you certainly need to approach and you're probably going to get leave if they do.

MR. BONDOR: Thank you, Your Honor.

THE COURT: Okay. No. 6, referring to an HTC fake document.

MR. HEARTFIELD: Yes, Your Honor. I think that in reading the opposition from MMI, there may be more agreement here than is really apparent. I believe that what MMI wants to use is a template document, a format document, a required data-type report that is -- was at issue during the questioning of Mr. Lee during his deposition.

Mr. Lee testified that when -- when he presented this template or format of the user usability studies that he wanted conducted, he developed a template basically like we would as lawyers create a draft pleading with Jane Doe in the blank to be submitted later with the real data. And in the -- the

data that was there was -- was referred to him as fake. The report is not fake, but it was to be used as the format and the reporting that he wanted to see.

So what I'm asking the Court is to grant a limine that they cannot say that we falsified or faked data. That is not the evidence that is before the Court in this case. What is really, I think, the issue for MMI is that HTC has some features that are studied by HTC in usability and market research.

THE COURT: All right. What's the Plaintiff's response?

MR. BONDOR: Plaintiff's response here is that it does seem that -- that there ought to be more agreement than perhaps there is. In this particular case, it's not us who are characterizing it as fake data. It's what the witness said. It's the witness' own words.

If the -- if HTC wants to explain or say that he didn't really mean it was fake, that it was really a template or format, you know, they can bring Mr. Lee and -- and he can say that. I -- I -- you know, the -- the documents themselves are -- are HTC documents. They, you know, purport to set forth usage statistics, and it certainly reveals the things that HTC is interested in capturing about its users in the

methods and the applications and data that it seeks to gather by virtue of its users.

Much later in the case, we actually got some of the products that HT -- or some documents that HTC maintains were -- were studies that were actually conducted, but, you know, this is -- this is one of those where we don't think that these documents themselves should be off limits simply because Mr. Lee said that the data in them is fake.

THE COURT: Mr. Heartfield, is Mr. Lee going to be presented by deposition only, or is he going to be presented live?

MR. HEARTFIELD: Right now I think deposition only, Your Honor. And -- and with the fear of being repetitive, I hope I'm not being repetitive, but what I don't want is the mischaracterization that we create false or misleading or fake data --

THE COURT: Well --

MR. HEARTFIELD: -- you know, so -- so if -- I hear the Court about, you know, the facts are the facts, but it's the characterization that I'm trying to prevent at this point, Your Honor.

THE COURT: I understand. The problem is if that characterization is from your witness, I can't protect you from your own witness' inartful choice of

words. I can protect you from the other side saying that you faked documents, but to the extent Mr. Lee is on HTC's side of this case, he chose in the deposition to call something fake when perhaps that was not the best choice of words, I can't limine out what he said under oath in a deposition just because now in the light of hindsight, it looks like a -- an inartful if not very poor choice of language on his part.

MR. HEARTFIELD: And -- and the Court is correct, and I agree, but in -- in full context of the dialog that occurred between, you know, the lawyer and the witness when it all comes out, I think it does become clear that it is not real data. You know, his use of the word "fake" should not then -- as though be used against me as a characterization of all the information that comes from my client.

THE COURT: You may just have to expand your counter designations to try to cover it. We can't change the deposition.

MR. HEARTFIELD: Can -- can I offer one other, this -- this data -- these templates were not referred to by a single one of their experts in developing any opinions as to, you know, survey information or usability surveys. So, you know, I think that we also have to look at the relevancy of the

information that is -- is being discussed.

THE COURT: That's another issue altogether, and relevance is probably not something I can properly take up at the limine stage. It is something I can take up the day before this deposition clip is going to be played between 7:30 and 8:30, if it's a relevance issue, once you see their designations and they see yours.

So for purposes of the limine, I think I've got to deny it because it's your witness and it's his choice of words and it's in a deposition that's already taken. You certainly have some latitude with your counter designations, and you're not precluded from urging a relevance objection at the time or just prior to the time it's offered, but until it's actually offered, I can't rule on relevance.

There's no indication -- at least from the way I read your motion, there's no indication that you're concerned that the Plaintiffs are going to allege HTC fakes documents or falsifies documents.

Now, if you have any --

MR. HEARTFIELD: I hope not.

THE COURT: Well, that's not the way I read your motion. If your motion does go to that, let's take that up. But if it doesn't, which is the way I read it, then it just goes to the deposition of Mr. Lee who is

your witness and we've all had witnesses who testified in a way that we wish they hadn't, but that's the way they testified. So I'm going to deny it for motion in limine purposes. I will look at relevance objections on a rolling basis before the deposition clip's played.

MR. HEARTFIELD: Could I indulge the Court on just a clarification? I -- I do understand what you're saying about his poor use of the word "fake," but it -- you know, I started out my -- my presentation and argument with what I thought was an agreement with MMI that they were not going to globally, you know, assert that we fake documents, that we provide fake, falsified information, just that these documents are -- touch -- touch upon user usability surveys that -- that are important to us. So --

THE COURT: Well, is there any intention on the part of MMI to take this deposition testimony of Mr. Lee and use that to make some statement to the jury that the Defendant fakes or makes up or falsifies documents?

MR. BONDOR: No. I -- I think that the issue as contained in the motion in limine and as it will present itself at trial, if at all, is limited to what Henry Lee said. I think that the case is otherwise going to be tried on things that have been authenticated

and are admitted into evidence, and that's what we're going to try the case on, the merits.

MR. HEARTFIELD: Thank you, Your Honor.

THE COURT: Okay. All right. For the record, Defendant's Motion in Limine 6 is denied.

7 is our next motion in limine from the Defendants. This has to do with the use of the words "search engine" and Dr. Cole apparent characterization of it in his report.

MR. BECKWITH: Your Honor, this is really directed to compliance with the Court's orders concerning claim construction.

If I could use the ELMO here in a way that -- there we go.

What we're looking at right here by the pen is what the claim says. The claim says, a search engine, and both parties had the opportunity, pursuant to the Court's docket control order and the local rules, to ask for any constructions that they needed to be addressed in connection with the Markman hearing. No one asked for search engine to be construed.

And imagine our surprise when we find out from Mr. Cole that he actually has a limiting construction of search engine. He wants to put a word in here before search. He wants to say that it has to

be an active search engine or a real-time search engine. He wants to put a word into the claim that doesn't exist.

And if that was MMI's intention, they needed to follow the Court's rules. They needed to identify this as something that needed to be -- to be construed. The parties would have then exchanged constructions. We would have submitted to the Court, the Court would have ruled on it, and we wouldn't be finding out three weeks, a month before trial that what we thought the claim meant because it says, a search engine, really means something that Mr. Cole was harboring in his head which is the real-time search engine or -- or the -- the active search engine.

What I would point to in particular, as well, on this is that this is an argument that recently came up in connection with the re-exam of this patent. The patent was submitted for re-examination, went through the entire re-examination process, and repeatedly MMI said to the Patent and Trademark Office, this claim is limited to real-time or active searches. And the Patent Office said, that's not the claim you drafted. The claim you drafted doesn't say, active. It doesn't say, real-time. If you want to have that limitation in your claim, you have to amend your claim

to put it in there. That was the Patent and Trademark's response.

That has since become -- from the PTO's perspective, final, and it's now on appeal, but this is a claim construction argument that they waived. They waived it by not asserting it in accordance with this Court's ruling.

And what I expect that we're going to hear from counsel on this is, well, the title of the patent says, real-time search capability. The title says, real-time. What that tells me is that the applicant knew how to use the words "real-time." And they chose to put it in the title. They didn't choose to put it in the claim. They may have wished that they had drafted a different claim, they may have wished that they would have included the words "real-time" in connection with the claim that they drafted, but they didn't. That's exactly what the PTO said, you didn't draft the claim that says, real-time search capability.

Mr. Cole is not the vehicle. His expert report and his testimony is not the vehicle to come in and usurp this Court's role in construing claims. The time to do that was months and months and months ago. MMI having failed to do so, having failed to offer a construction, this limiting construction, basically a

disclaimer, they've waived that. And so we don't want the jury to be confused when they see the claim, they see the Court's construction, and then we have an expert saying, oh, actually, there's more to it than that. Let me fill it in for you. It's going to confuse the jury. So that's the basis for our motion.

THE COURT: All right. Let me hear a response from the Plaintiff.

MR. MCDAVIT: Your Honor, what you just heard was a Daubert motion in -- in the MIL.

Neither party proposed the construction of search engine. If a party doesn't propose the construction, then the claim gets -- the claim and the claim words get interpreted as -- by one of ordinary skill. And if they disagree with Mr. Cole's substantive position on what would -- one of ordinary skill would have understood that term to mean in the context of the patent, then there's certainly -- they're certainly able to cross him on it and put their own expert on and say what his opinion of one of -- one of ordinary skill would be.

But having not -- having -- HTC didn't come forward and propose construing that term. No one came forward and proposed construing that term, so it remains a term that has been unconstrued in the patent, and the

experts are -- are to opine as to what that term would mean to one of ordinary skill in the art. And I don't know that there's anything more to say about that.

THE COURT: All right. Well, the Court's going to deny Defendant's Motion in Limine 7.

If the Plaintiff's expert does say, active search, real-time search, it's certainly subject to cross-examination before the jury, just like we saw in the patent and show that it's not in the claim.

Now, the Defendants are also going to have their expert who can -- who can effectively testify in the opposite direction and make it clear that Mr. Cole or Dr. Cole's opinion is different than his opinion -- his or her opinion. This seems like to me it's certainly an issue for the jury, and I don't find that it's a backdoor claim construction.

Sometimes, Defendants, the best thing a Plaintiff can do is put on something that's erroneous and you can make it clearly erroneous. They may be handing you a gift here, so I would -- I would do you a great disservice if I limined it out. So I'm going to deny that Motion in Limine No. 7.

And we'll go next to No. 8, patents that have been blessed by the PTO. I'd like -- I'd like to understand the procedure for blessing the PTO.

MR. LIN: So for -- for this motion in limine, the parties have actually reached a partial agreement. MMI's agreed not to argue that any of the patents-in-suit have any enhanced validity by virtue of having emerged from re-examination.

Our only remaining concern is that MMI may try to characterize some of these patents in a way that only tells the jury half of the story.

As Mr. Chaikovsky mentioned this morning in connection with MMI's Motion in Limine No. 1, some of these patents have gone to re-exam, they have emerged with a re-examination certificate only to be put back into re-exam and they're pending. So MMI would only talk about the first half of the story, the first re-examination, and not the second half of the story.

And this is relevant in connection with -- let me just give the Court an example. In the '078 patent, in the first re-examination, Hassan was a patent that was considered by the PTO, and the PTO said, Hassan is not anticipatory to some of the asserted claims.

In the pending re-exam, the Patent Office has revisited Hassan and has determined that there's a -- there's a substantial new question of patentability as to Hassan in combination with other references.

So, basically, we don't want MMI to come up

here and say, you know, the PTO has considered Hassan and, you know, has washed its hands of Hassan when that's not really the case. There's a pending re-examination where the Hassan reference is being considered a second time in the '103 context.

THE COURT: And if they open that door, counsel, you can't cross-examine their witness on that very point and make it clear that what they just indicated is not the case?

MR. LIN: I suppose we could.

THE COURT: Let me hear from the Plaintiff.

MR. MCDAVIT: Your Honor, our only -- what Mr. Lin said was -- was mostly correct. I mean, we -- we did agree not to use the words that they didn't want us to use in their -- in their motion in limine. And we've already addressed, I believe, with our Motion in Limine No. 1 that references to pending re-examinations are out, subject to Your -- Your Honor's characterization.

So I'm not sure there's that much more to talk about in this -- this motion in limine, unless you have any other specific questions for me.

THE COURT: Well, you've heard the Defendant's argument. Tell me -- tell me how you intend to use this.

MR. MCDAVIT: The -- a re-examination that has been closed and has been final is a record in part of the -- now part of the file history of -- of the patent, and it's relevant for those reasons. And what the Court -- what the PTO looked at and what they said about the prior art and the prior art that they looked at, those are all things that we're entitled to -- to tell the jury because that's what has happened in the Patent Office.

If it's pending, then there is an uncertain future as to what is going to happen, as to what arguments are going to be finally be made final, what positions the parties are going to take, what position the Patent Office is going to take, and for the reasons explained by -- by Mr. Bondor earlier, those aren't -- those aren't relevant to -- to this case.

THE COURT: Well, I granted the Plaintiff's motion in limine on communications to the Patent Office. I'm going to grant the Defendant's motion in limine on the same basis. It's not an ultimate exclusion. It's a requirement that you approach and get leave before you go into it. And if you can show me there's a reasonable relevant basis, I'm not telling you it won't come in, but you are going to have to approach before you go there.

MR. MCDAVIT: Just -- just so I have clarification, before we go and ask our witnesses about final re-exams, we would need to approach Your Honor and ask permission? Is that -- is that the ruling? I -- I just want to make sure we understand what the parameters are.

THE COURT: Well, let me say it this way. This jury is trying these patents. They're not here to be told what the PTO has done and therefore they should do the same thing.

MR. MCDAVIT: Yes, Your Honor.

THE COURT: They're here to make a determination for themselves based on the evidence and the opinions of the experts. So to the extent either side thinks the previous activities and transactions and events before the PTO are relevant and aid in this jury's determination and adjudication of those issues, they need to approach and get leave before they go into it, all right?

And I want to remind everybody, these rulings on motions in limine are going to apply to your opening statements. So if I've precluded it, you don't go into it in opening statement, okay?

All right. Let's go to the next one, which is No. 9. I previously indicated in ruling on the

Plaintiff's that we're not going to talk about obstructed discovery. I'm going to grant this No. 9 for the Defendants for the same reason on the same basis.

That brings us to No. 10, HTC's total revenue or operating profits. Here, again, this is one of these we put it up there because they might open the door. The door hadn't been opened yet, but I'll hear your argument on it.

MR. ALBERTI: Thank you, Your Honor, and it will be brief because it -- the heartbeat of this is directly related to the Daubert which we'll take up here shortly in terms of Plaintiff's attempt to throw around numbers like 1.5 billion in operating profits and other aspects that they try to weave in through the, quote, hypothetical negotiations, but I will address those deficiencies in the Daubert motion.

I would -- as long as I have this opportunity, and I would respectfully request on terms of No. 5, that was the don't discuss anything about -- I think Mr. Bondor said he wouldn't make comment about Texas citizens. Is that --

MR. BONDOR: No, what I said is assuming you don't open the door with respect to talking about HTC's connections with Texas or employment of Texas citizens, then there's no issue and we don't need to raise the

issue. And I thought that was the agreement between the parties.

MR. ALBERTI: So Mr. Bondor spoke very quickly when he got to the word "citizens," and I just want to clear -- be really clear. If we have a witness who was raised here in Texas who's a director of retail marketing and lives in Bellevue, Washington, and she's asked where she was -- she went to school at the University of Texas, I don't know if that's technically a citizen, but I don't want to get into anybody's -- you know, on anybody's wrong side that we can't say that. You don't have a problem with that, right?

THE COURT: I don't have a problem with that, but --

MR. ALBERTI: Mr. Bondor, do you?

THE COURT: -- you all need to meet and confer fully before you go there. My understanding of the -- of the competing motions in limine were that HTC wasn't going to say it's a Texas entity and try to obtain goodwill from the jury because of that. But who and where the individual witnesses may have grown up or gone to school, I don't think that falls under this purview at all.

MR. ALBERTI: Okay. Thank you, Your Honor.

MR. PACKIN: Your Honor, was -- just for

clarification, was 10 denied for the same reason that --

THE COURT: Well, we got off the track, counsel. We're about to get back on the track.

MR. ALBERTI: Well, 10, we're basically talking about in Daubert, at least from my perspective, so if you want to use that format of denying it until we take it up, that's fine with me.

THE COURT: Well, I do think that HTC's total revenues and operating profits are not a proper area, unless somebody opens the door to it. My inclination, notwithstanding Daubert, is to grant the motion in limine.

MR. ALBERTI: Yes, thank you, thank you, appreciate it.

MR. PACKIN: Your Honor, just for clarification, because I think that the parties were not necessarily on the same page on this one, you know, in our -- in our brief, we said that we have no intention of going into HTC's total.

THE COURT: Right.

MR. PACKIN: When we're talking about HTC's total, we're talking about the total from the annual report, not some subtotal that's limited to the accused products --

THE COURT: And that's why it's a subtotal,

counsel.

MR. PACKIN: Okay.

THE COURT: I understand that.

MR. PACKIN: Yeah, okay, thank you.

MR. ALBERTI: I thought that was agreed to.

THE COURT: All right. That brings us then -- unless there are further questions, that brings us to Defendant's Motion in Limine No. 11, non-infringing alternatives.

MR. ALBERTI: Yes, thank you, Your Honor. Again, I'll be brief.

The non-infringing alternative motion was directly geared to the fact that, number one, there was no reference in any of the expert reports. And, number two, now that Plaintiff has limited -- reduced the number of patents before the Court, specifically as to the '075 and the '078, their expert, Meldal, did not discuss even in his deposition, let alone in his report, anything about non-infringing alternatives.

And, again, I'm trying to follow the Court's strong message or directive, don't go outside of an expert report, and I'm going beyond that and saying, at least as to the '075 and the '078, there was absolutely nothing in their expert -- in their deposition.

So if Mr. Sims tries to come in and state he

didn't need to look at non-infringing alternatives because his expert told him there weren't any, one, it would violate your strict rule about not in the report, and, two, the technical expert didn't even do it in a deposition. So it should be off limits, particularly as to the '075 and '078, it being non-infringing alternatives.

THE COURT: What's the Plaintiff's response?

MR. PACKIN: I think counsel left something very important out of this story, which is the Defendants bear the burden of proving that there are non-infringing alternatives, that they're available, commercially acceptable. We cited a case in our brief, the Data Treasury case, that was decided by Judge Folsom in 2011. And just for the record, it's 2011 WL 8810604. So the Defendants bear the burden of proving non-infringing alternatives.

What happened in this case was that the Defendants in their opening burden of proof expert reports did not say anything about non-infringing alternatives. So then we get to the -- and that was in early January. We fast forward a month to the responsive reports. Their technical experts didn't have anything in their opening expert reports about something that they bore the burden of proof on. And so our

technical experts didn't respond.

What they ended up doing is putting it in their rebuttal expert reports, and so our experts didn't have a formal opportunity to address that in any sort of expert report under the Court's schedule. So quite frankly, we think that the whole issue of non-infringing alternatives doesn't belong in the case because it came in too late and wasn't properly disclosed. But fairness mandates that if the Defendant's experts are allowed to talk about it, our experts should be permitted to rebut those positions because they disagree with it.

What our experts said at the depositions was in direct response to Defendant's questioning. They didn't start making speeches about things that they weren't asked about.

So, you know, the fact that Defendants strategically, you know, saw that some experts had opinions that disagreed with their experts on non-infringing alternatives and then they said, oh, we better not ask the other experts about that because we don't want to get that on the record, I mean, that -- that doesn't show anything.

So our position is simply that, you know, quite frankly, it should all be kept out, but if they're allowed to talk about something that they introduced in

a rebuttal report, that they bear the burden of proof on, and we never had an opportunity to submit an expert report addressing it specifically, we should at least be entitled to rebuttal of what that testimony is.

MR. ALBERTI: Briefly, Your Honor. If they're saying that our non-infringing alternative argument should be stricken, that is a Daubert motion, and they didn't file it. We do have non-infringing alternative material that's incorporated in our expert report that has support from the technical expert, and, you know, again, you can't argue a Daubert on the fly.

MR. PACKIN: It -- it's not a -- I'm not trying to argue a Daubert. I'm saying that if it comes in, we're permitted to -- we should be permitted to respond in fairness. If you take it all -- you know, don't let either side, we're okay with that. I'm -- I was just offering that as an alternative, but it's not meant to be Daubert.

THE COURT: Well, I don't see a reason to grant it on limine. That's not to say there's not some other basis upon which this ought to stay out. However, I don't intend, unless I have no other alternative, to let one side blindside the other in this trial. If it comes in for one, it ought to come in for both. If it stays out for one, it ought to stay out for both.

And there are other tools at the Court's disposal, rather than limine, to deal with this if it comes up at the time of trial. So I'm not going to grant Defendant's Motion in Limine 11, but I'm going to express myself to the parties so that they understand that this is not a game of gotcha, and you didn't say it, but I get to say it.

This is going to be a teed-up lawsuit where you're both going to take your best shot, both are going to get to tell their stories, and those eight men and women in the jury box are going to decide it. It's going to be a fair fight. It may be a hard fight, but it's going to be a fair fight, all right?

All right. For the record, Defendant's Motion in Limine No. 11 is denied.

Those appear, to me, to be all of the disputed motions in limine.

Counsel, are either side aware of anything we overlooked on motions in limine?

MR. MCMAHON: Yes, Your Honor, if I may.

THE COURT: You may.

MR. MCMAHON: On the -- the willfulness that we argued this morning, part of that was to limit the Plaintiff's evidence to what's -- in terms of willfulness, to what's contained in their July 14th,

2011 answer to interrogatory. And anything beyond that should be inadmissible.

So we certainly argued that and -- and laid that out in our papers. They responded to it, and I believe that -- that before they try to add anything else, including what they did in -- as part of the pre-trial order process, you know, nine pieces of -- of deposition testimony should not be allowed unless first you give leave because they are limited to this answer. Those are the rules.

THE COURT: Well, why don't you do this, counsel. Why don't you start with telling me which motion in limine you're referring to or which motion in limine the Court's not dealt with and I can focus on that. I asked was there some motion in limine or some related matter that we haven't disposed of and --

MR. MCMAHON: I understand.

THE COURT: -- I'm not sure where you're going. You need to clarify yourself.

MR. MCMAHON: Yes, thank you, Your Honor.

This was our motion on willfulness that we had filed. We -- we talked about it some this morning. And then part of it is an evidentiary motion that -- that -- that Plaintiff should be precluded by limine or otherwise, not going into anything other than what they

laid out in their answer to interrogatory on July 14th of 2011.

THE COURT: Are you back on Defendant's motion for leave to file a willfulness --

MR. MCMAHON: Yes, Your Honor.

THE COURT: -- that I ruled on earlier this morning?

MR. MCMAHON: Yes, Your Honor.

THE COURT: That's not a limine matter, counsel. I've already ruled on that.

Are there unaddressed motions in limine before the Court that you're aware of?

MR. MCMAHON: No, Your Honor.

THE COURT: Thank you.

MR. MCMAHON: May I just say that if they try to add any willfulness evidence that, you know, at that point in time, I will approach and I want to have that discussed before they do it.

THE COURT: Well, I'll say this. I expect both sides to be open with each other during the trial of this case. And if there are surprises, I want to know about them before this jury gets in the box. And that's part of why I will be getting up earlier than I would otherwise and dragging myself to this courthouse to afford you a full hour to take up any disputes that

arise the night before. And woe to he or she who ignores that and then brings up a surprise, especially when I've got the jury in the box.

MR. MCMAHON: Be pleased to join you on this issue, one of those 7:30's in the mornings.

THE COURT: If it's necessary, it's available for that purpose, okay?

MR. MCMAHON: Thank you, Your Honor.

THE COURT: All right. Counsel, I know we have other ground to cover, but the Court's schedule -- I afforded 9:00 to 12:00 this morning for pre-trial. We're at five minutes or four minutes until 4:00 o'clock. I'm not going to go any further today. We'll reconvene the pre -- pre-trial process after jury selection on the 29th. If necessary, we'll set additional pre-trial hearings before the case-in-chief begins.

I'll expect you to go forward with the mediation that you talked about, and I will see you for the jury selection on the 29th.

The Court stands in recess.

COURT SECURITY OFFICER: All rise.

(Hearing concluded.)

CERTIFICATION

I HEREBY CERTIFY that the foregoing is a true and correct transcript from the stenographic notes of the proceedings in the above-entitled matter to the best of my ability.

SHELLY HOLMES Date
Deputy Official Reporter
State of Texas No.: 7804
Expiration Date: 12/31/14